(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, DBA NIFLA, ET AL. *v.* BECERRA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 16–1140. Argued March 20, 2018—Decided June 26, 2018

The California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act (FACT Act) was enacted to regulate crisis pregnancy centers—pro-life centers that offer pregnancy-related services. The FACT Act requires clinics that primarily serve pregnant women to provide certain notices. Clinics that are licensed must notify women that California provides free or low-cost services, including abortions, and give them a phone number to call. Its stated purpose is to make sure that state residents know their rights and what health care services are available to them. Unlicensed clinics must notify women that California has not licensed the clinics to provide medical services. Its stated purpose is to ensure that pregnant women know when they are receiving health care from licensed professionals. Petitioners—two crisis pregnancy centers, one licensed and one unlicensed, and an organization of crisis pregnancy centers— filed suit. They alleged that both the licensed and the unlicensed notices abridge the freedom of speech protected by the First Amendment. The District Court denied their motion for a preliminary injunction, and the Ninth Circuit affirmed. Holding that petitioners could not show a likelihood of success on the merits, the court concluded that the licensed notice survived a lower level of scrutiny applicable to regulations of "professional speech," and that the unlicensed notice satisfied any level of scrutiny.

*Held*:

1. The licensed notice likely violates the First Amendment. Pp. 6–17.

   (a) Content-based laws "target speech based on its communica-

tive content" and "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed* v. *Town of Gilbert*, 576 U. S. ___, ___. The licensed notice is a content-based regulation. By compelling petitioners to speak a particular message, it "alters the content of [their] speech." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795. For example, one of the state-sponsored services that the licensed notice requires petitioners to advertise is abortion—the very practice that petitioners are devoted to opposing. Pp. 6–7.

(b) Although the licensed notice is content-based, the Ninth Circuit did not apply strict scrutiny because it concluded that the notice regulates "professional speech." But this Court has never recognized "professional speech" as a separate category of speech subject to different rules. Speech is not unprotected merely because it is uttered by professionals. The Court has afforded less protection for professional speech in two circumstances—where a law requires professionals to disclose factual, noncontroversial information in their "commercial speech," see, *e.g., Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 651, and where States regulate professional conduct that incidentally involves speech, see, *e.g.*, *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456. Neither line of precedents is implicated here. Pp. 7–14.

(1) Unlike the rule in *Zauderer,* the licensed notice is not limited to "purely factual and uncontroversial information about the terms under which . . . services will be available," 471 U. S., at 651. California's notice requires covered clinics to disclose information about *state*-sponsored services—including abortion, hardly an "uncontroversial" topic. Accordingly, *Zauderer* has no application here. P. 9.

(2) Nor is the licensed notice a regulation of professional conduct that incidentally burdens speech. The Court's precedents have long drawn a line between speech and conduct. In *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, for example, the joint opinion rejected a free-speech challenge to an informed-consent law requiring physicians to "give a woman certain information as part of obtaining her consent to an abortion," *id.,* at 884. But the licensed notice is neither an informed-consent requirement nor any other regulation of professional conduct. It applies to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed. And many other facilities providing the exact same services, such as general practice clinics, are not subject to the requirement. Pp. 10–11.

(3) Outside of these two contexts, the Court's precedents have long protected the First Amendment rights of professionals. The Court

has applied strict scrutiny to content-based laws regulating the non-commercial speech of lawyers, see *Reed*, *supra,* at ___, professional fundraisers, see *Riley*, *supra*, at 798, and organizations providing specialized advice on international law, see *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 27–28. And it has stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives." *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 566. Such dangers are also present in the context of professional speech, where content-based regulation poses the same "risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information," *Turner Broadcasting Systems, Inc.* v. *FCC*, 512 U. S. 622, 641. When the government polices the content of professional speech, it can fail to " 'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.' " *McCullen* v. *Coakley*, 573 U. S. ___, ___–___. Professional speech is also a difficult category to define with precision. See *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 791. If States could choose the protection that speech receives simply by requiring a license, they would have a powerful tool to impose "invidious discrimination of disfavored subjects." *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 423, n. 19. Pp. 11–14.

(c) Although neither California nor the Ninth Circuit have advanced a persuasive reason to apply different rules to professional speech, the Court need not foreclose the possibility that some such reason exists because the licensed notice cannot survive even intermediate scrutiny. Assuming that California's interest in providing low-income women with information about state-sponsored service is substantial, the licensed notice is not sufficiently drawn to promote it. The notice is "wildly underinclusive," *Entertainment Merchants Assn.*, *supra,* at 802, because it applies only to clinics that have a "primary purpose" of "providing family planning or pregnancy-related services" while excluding several other types of clinics that also serve low-income women and could educate them about the State's services. California could also inform the women about its services "without burdening a speaker with unwanted speech," *Riley*, *supra*, at 800, most obviously through a public-information campaign. Petitioners are thus likely to succeed on the merits of their challenge. Pp. 14–17.

2. The unlicensed notice unduly burdens protected speech. It is unnecessary to decide whether *Zauderer*'s standard applies here, for even under *Zauderer,* a disclosure requirement cannot be "unjustified or unduly burdensome." 471 U. S., at 651. Disclosures must remedy a harm that is "potentially real not purely hypothetical," *Ibanez* v. *Florida Dept. of Business and Professional Regulation, Bd. of Ac-*

*countancy*, 512 U. S. 136, 146, and can extend "no broader than rea-
sonably necessary," *In re R. M. J.*, 455 U. S. 191, 203. California has
not demonstrated any justification for the unlicensed notice that is
more than "purely hypothetical." The only justification put forward
by the state legislature was ensuring that pregnant women know
when they are receiving medical care from licensed professionals, but
California denied that the justification for the law was that women
did not know what kind of facility they are entering when they go to a
crisis pregnancy center. Even if the State had presented a nonhypo-
thetical justification, the FACT Act unduly burdens protected speech.
It imposes a government-scripted, speaker-based disclosure require-
ment that is wholly disconnected from the State's informational in-
terest. It requires covered facilities to post California's precise notice,
no matter what the facilities say on site or in their advertisements.
And it covers a curiously narrow subset of speakers: those that pri-
marily provide pregnancy-related services, but not those that pro-
vide, *e.g.,* nonprescription birth control. Such speaker-based laws
run the risk that "the State has left unburdened those speakers
whose messages are in accord with its own views." *Sorrell, supra,* at
580. For these reasons, the unlicensed notice does not satisfy *Zau-
derer*, assuming that standard applies. Pp. 17–20.

839 F. 3d 823, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and KENNEDY, ALITO, and GORSUCH, JJ., joined. KENNEDY, J., filed
a concurring opinion, in which ROBERTS, C. J., and ALITO and GORSUCH,
JJ., joined. BREYER, J., filed dissenting opinion, in which GINSBURG,
SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 16–1140

———

## NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, DBA NIFLA, ET AL., PETITIONERS *v.* XAVIER BECERRA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

JUSTICE THOMAS delivered the opinion of the Court.

The California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act (FACT Act) requires clinics that primarily serve pregnant women to provide certain notices. Cal. Health & Safety Code Ann. §123470 *et seq.* (West 2018). Licensed clinics must notify women that California provides free or low-cost services, including abortions, and give them a phone number to call. Unlicensed clinics must notify women that California has not licensed the clinics to provide medical services. The question in this case is whether these notice requirements violate the First Amendment.

I

A

The California State Legislature enacted the FACT Act to regulate crisis pregnancy centers. Crisis pregnancy centers—according to a report commissioned by the California State Assembly, App. 86—are "pro-life (largely Christian belief-based) organizations that offer a limited

range of free pregnancy options, counseling, and other services to individuals that visit a center." Watters et al., Pregnancy Resource Centers: Ensuring Access and Accuracy of Information 4 (2011). "[U]nfortunately," the author of the FACT Act stated, "there are nearly 200 licensed and unlicensed" crisis pregnancy centers in California. App. 84. These centers "aim to discourage and prevent women from seeking abortions." *Id.,* at 85. The author of the FACT Act observed that crisis pregnancy centers "are commonly affiliated with, or run by organizations whose stated goal" is to oppose abortion—including "the National Institute of Family and Life Advocates," one of the petitioners here. *Ibid.* To address this perceived problem, the FACT Act imposes two notice requirements on facilities that provide pregnancy-related services—one for licensed facilities and one for unlicensed facilities.

1

The first notice requirement applies to "licensed covered facilit[ies]." Cal. Health & Safety Code Ann. §123471(a). To fall under the definition of "licensed covered facility," a clinic must be a licensed primary care or specialty clinic or qualify as an intermittent clinic under California law. *Ibid.* (citing §§1204, 1206(h)). A licensed covered facility also must have the "primary purpose" of "providing family planning or pregnancy-related services." §123471(a). And it must satisfy at least two of the following six requirements:

> "(1) The facility offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant women.
>
> "(2) The facility provides, or offers counseling about, contraception or contraceptive methods.
>
> "(3) The facility offers pregnancy testing or pregnancy diagnosis.
>
> "(4) The facility advertises or solicits patrons with of-

fers to provide prenatal sonography, pregnancy tests, or pregnancy options counseling.

"(5) The facility offers abortion services.

"(6) The facility has staff or volunteers who collect health information from clients." *Ibid.*

The FACT Act exempts several categories of clinics that would otherwise qualify as licensed covered facilities. Clinics operated by the United States or a federal agency are excluded, as are clinics that are "enrolled as a Medi-Cal provider" and participate in "the Family Planning, Access, Care, and Treatment Program" (Family PACT program). §123471(c). To participate in the Family PACT program, a clinic must provide "the full scope of family planning . . . services specified for the program," Cal. Welf. & Inst. Code Ann. §24005(c) (West 2018), including sterilization and emergency contraceptive pills, §§24007(a)(1), (2).

If a clinic is a licensed covered facility, the FACT Act requires it to disseminate a government-drafted notice on site. Cal. Health & Safety Code Ann. §123472(a)(1). The notice states that "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women. To determine whether you qualify, contact the county social services office at [insert the telephone number]." *Ibid.* This notice must be posted in the waiting room, printed and distributed to all clients, or provided digitally at check-in. §123472(a)(2). The notice must be in English and any additional languages identified by state law. §123472(a). In some counties, that means the notice must be spelled out in 13 different languages. See State of Cal., Dept. of Health Care Services, Frequency of Threshold Language Speakers in the Medi-

Cal Population by County for Jan. 2015, pp. 4–5 (Sept. 2016) (identifying the required languages for Los Angeles County as English, Spanish, Armenian, Mandarin, Cantonese, Korean, Vietnamese, Farsi, Tagalog, Russian, Cambodian, Other Chinese, and Arabic).

The stated purpose of the FACT Act, including its licensed notice requirement, is to "ensure that California residents make their personal reproductive health care decisions knowing their rights and the health care services available to them." 2015 Cal. Legis. Serv. Ch. 700, §2 (A. B. 775) (West) (Cal. Legis. Serv.). The Legislature posited that "thousands of women remain unaware of the public programs available to provide them with contraception, health education and counseling, family planning, prenatal care, abortion, or delivery." §1(b). Citing the "time sensitive" nature of pregnancy-related decisions, §1(c), the Legislature concluded that requiring licensed facilities to inform patients themselves would be "[t]he most effective" way to convey this information, §1(d).

2

The second notice requirement in the FACT Act applies to "unlicensed covered facilit[ies]." §123471(b). To fall under the definition of "unlicensed covered facility," a facility must not be licensed by the State, not have a licensed medical provider on staff or under contract, and have the "primary purpose" of "providing pregnancy-related services." *Ibid.* An unlicensed covered facility also must satisfy at least two of the following four requirements:

> "(1) The facility offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant women.
>
> "(2) The facility offers pregnancy testing or pregnancy diagnosis.
>
> "(3) The facility advertises or solicits patrons with of-

fers to provide prenatal sonography, pregnancy tests, or pregnancy options counseling.

"(4) The facility has staff or volunteers who collect health information from clients." *Ibid.*

Clinics operated by the United States and licensed primary care clinics enrolled in Medi-Cal and Family PACT are excluded. §123471(c).

Unlicensed covered facilities must provide a government-drafted notice stating that "[t]his facility is not licensed as a medical facility by the State of California and has no licensed medical provider who provides or directly supervises the provision of services." Cal. Health & Safety Code Ann. §123472(b)(1). This notice must be provided on site and in all advertising materials. §§123472(b)(2), (3). Onsite, the notice must be posted "conspicuously" at the entrance of the facility and in at least one waiting area. §123472(b)(2). It must be "at least 8.5 inches by 11 inches and written in no less than 48-point type." *Ibid.* In advertisements, the notice must be in the same size or larger font than the surrounding text, or otherwise set off in a way that draws attention to it. §123472(b)(3). Like the licensed notice, the unlicensed notice must be in English and any additional languages specified by state law. §123471(b). Its stated purpose is to ensure "that pregnant women in California know when they are getting medical care from licensed professionals." Cal. Legis. Serv., §1(e).

B

After the Governor of California signed the FACT Act, petitioners—a licensed pregnancy center, an unlicensed pregnancy center, and an organization composed of crisis pregnancy centers—filed this suit. Petitioners alleged that the licensed and unlicensed notices abridge the freedom of speech protected by the First Amendment. The District Court denied their motion for a preliminary

injunction.

The Court of Appeals for the Ninth Circuit affirmed. *National Institute of Family and Life Advocates* v. *Harris*, 839 F. 3d 823, 845 (2016). After concluding that petitioners' challenge to the FACT Act was ripe,[1] *id.,* at 833*,* the Ninth Circuit held that petitioners could not show a likelihood of success on the merits. It concluded that the licensed notice survives the "lower level of scrutiny" that applies to regulations of "professional speech." *Id.*, at 833–842. And it concluded that the unlicensed notice satisfies any level of scrutiny. See *id.,* at 843–844.

We granted certiorari to review the Ninth Circuit's decision. 583 U. S. ___ (2017). We reverse with respect to both notice requirements.

## II

We first address the licensed notice.[2]

## A

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech. When enforcing this prohibition, our precedents distinguish between content-based and content-neutral regulations of speech. Content-based regulations "target speech based on its communicative content." *Reed* v. *Town of Gilbert*, 576 U. S. ___, ___ (2015) (slip op., at 6). As a general matter, such laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Ibid.* This stringent standard reflects the fundamental principle that govern-

_____

[1] We agree with the Ninth Circuit's ripeness determination.

[2] Petitioners raise serious concerns that both the licensed and unlicensed notices discriminate based on viewpoint. Because the notices are unconstitutional either way, as explained below, we need not reach that issue.

ments have "'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ibid.* (quoting *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972)).

The licensed notice is a content-based regulation of speech. By compelling individuals to speak a particular message, such notices "alte[r] the content of [their] speech." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795 (1988); accord, *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642 (1994); *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 256 (1974). Here, for example, licensed clinics must provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them. One of those services is abortion—the very practice that petitioners are devoted to opposing. By requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option— the licensed notice plainly "alters the content" of petitioners' speech. *Riley, supra*, at 795.

B

Although the licensed notice is content based, the Ninth Circuit did not apply strict scrutiny because it concluded that the notice regulates "professional speech." 839 F. 3d, at 839. Some Courts of Appeals have recognized "professional speech" as a separate category of speech that is subject to different rules. See, *e.g., King* v. *Governors of New Jersey*, 767 F. 3d 216, 232 (CA3 2014); *Pickup* v. *Brown*, 740 F. 3d 1208, 1227–1229 (CA9 2014); *Moore-King* v. *County of Chesterfield*, 708 F. 3d 560, 568–570 (CA4 2014). These courts define "professionals" as individuals who provide personalized services to clients and who are subject to "a generally applicable licensing and regulatory regime." *Id.*, at 569; see also, *King, supra*, at

232; *Pickup*, *supra*, at 1230. "Professional speech" is then defined as any speech by these individuals that is based on "[their] expert knowledge and judgment," *King*, *supra*, at 232, or that is "within the confines of [the] professional relationship," *Pickup*, *supra*, at 1228. So defined, these courts except professional speech from the rule that content-based regulations of speech are subject to strict scrutiny. See *King*, *supra*, at 232; *Pickup*, *supra*, at 1053–1056; *Moore-King*, *supra*, at 569.

But this Court has not recognized "professional speech" as a separate category of speech. Speech is not unprotected merely because it is uttered by "professionals." This Court has "been reluctant to mark off new categories of speech for diminished constitutional protection." *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 804 (1996) (KENNEDY, J., concurring in part, concurring in judgment in part, and dissenting in part). And it has been especially reluctant to "exemp[t] a category of speech from the normal prohibition on content-based restrictions." *United States* v. *Alvarez*, 567 U. S. 709, 722 (2012) (plurality opinion). This Court's precedents do not permit governments to impose content-based restrictions on speech without "'persuasive evidence . . . of a long (if heretofore unrecognized) tradition'" to that effect. *Ibid.* (quoting *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 792 (2011)).

This Court's precedents do not recognize such a tradition for a category called "professional speech." This Court has afforded less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking. First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their "commercial speech." See, *e.g., Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 651 (1985); *Milavetz, Gallop & Milavetz,*

*P. A.* v. *United States*, 559 U. S. 229, 250 (2010); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978). Second, under our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech. See, *e.g., id.*, at 456; *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 884 (1992) (opinion of O'Connor, KENNEDY, and Souter, JJ.). But neither line of precedents is implicated here.

1

This Court's precedents have applied a lower level of scrutiny to laws that compel disclosures in certain contexts. In *Zauderer*, for example, this Court upheld a rule requiring lawyers who advertised their services on a contingency-fee basis to disclose that clients might be required to pay some fees and costs. 471 U. S., at 650–653. Noting that the disclosure requirement governed only "commercial advertising" and required the disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available," the Court explained that such requirements should be upheld unless they are "unjustified or unduly burdensome." *Id.,* at 651.

The *Zauderer* standard does not apply here. Most obviously, the licensed notice is not limited to "purely factual and uncontroversial information about the terms under which . . . services will be available." 471 U. S., at 651; see also *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 573 (1995) (explaining that *Zauderer* does not apply outside of these circumstances). The notice in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services—including abortion, anything but an "uncontroversial" topic. Accordingly, *Zauderer* has no application here.

2

In addition to disclosure requirements under *Zauderer*, this Court has upheld regulations of professional conduct that incidentally burden speech. "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech," *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 567 (2011), and professionals are no exception to this rule, see *Ohralik, supra*, at 456. Longstanding torts for professional malpractice, for example, "fall within the traditional purview of state regulation of professional conduct." *NAACP* v. *Button*, 371 U. S. 415, 438 (1963); but cf. *id.,* at 439 ("[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights"). While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it, see*, e.g., Sorrell*, *supra*, at 567; *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949), and the line is "'long familiar to the bar,'" *United States* v. *Stevens*, 559 U. S. 460, 468 (2010) (quoting *Simon & Schuster, Inc.* v. *Members of N. Y State Crime Victims Bd.*, 502 U. S. 105, 127 (1991) (KENNEDY, J., concurring in judgment)).

In *Planned Parenthood of Southeastern Pa.* v. *Casey*, for example, this Court upheld a law requiring physicians to obtain informed consent before they could perform an abortion. 505 U. S., at 884 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.). Pennsylvania law required physicians to inform their patients of "the nature of the procedure, the health risks of the abortion and childbirth, and the 'probable gestational age of the unborn child.'" *Id.,* at 881. The law also required physicians to inform patients of the availability of printed materials from the State, which provided information about the child and various forms of assistance. *Ibid.*

The joint opinion in *Casey* rejected a free-speech challenge to this informed-consent requirement. *Id.*, at 884. It

described the Pennsylvania law as "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion," which "for constitutional purposes, [was] no different from a requirement that a doctor give certain specific information about any medical procedure." *Ibid.* The joint opinion explained that the law regulated speech only "as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State." *Ibid.* (emphasis added). Indeed, the requirement that a doctor obtain informed consent to perform an operation is "firmly entrenched in American tort law." *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 269 (1990); see, *e.g., Schloendorff* v. *Society of N. Y. Hospital*, 211 N. Y. 125, 129–130, 105 N. E. 92, 93 (1914) (Cardozo, J.) (explaining that "a surgeon who performs an operation without his patient's consent commits an assault").

The licensed notice at issue here is not an informed-consent requirement or any other regulation of professional conduct. The notice does not facilitate informed consent to a medical procedure. In fact, it is not tied to a procedure at all. It applies to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed. If a covered facility does provide medical procedures, the notice provides no information about the risks or benefits of those procedures. Tellingly, many facilities that provide the exact same services as covered facilities—such as general practice clinics, see §123471(a)—are not required to provide the licensed notice. The licensed notice regulates speech as speech.

3

Outside of the two contexts discussed above—disclosures under *Zauderer* and professional conduct—this Court's precedents have long protected the First Amendment rights of professionals. For example, this Court has

applied strict scrutiny to content-based laws that regulate
the noncommercial speech of lawyers, see *Reed*, 576 U. S.,
at ___ (slip op., at 10) (discussing *Button*, *supra*, at 438);
*In re Primus*, 436 U. S. 412, 432 (1978); professional fund-
raisers, see *Riley*, 487 U. S., at 798; and organizations that
provided specialized advice about international law, see
*Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 27–28
(2010).   And the Court emphasized that the lawyer's
statements in *Zauderer* would have been "fully protected"
if they were made in a context other than advertising.  471
U. S., at 637, n. 7.  Moreover, this Court has stressed the
danger of content-based regulations "in the fields of medi-
cine and public health, where information can save lives."
*Sorrell*, *supra*, at 566.

The dangers associated with content-based regulations
of speech are also present in the context of professional
speech.   As with other kinds of speech, regulating the
content of professionals' speech "pose[s] the inherent risk
that the Government seeks not to advance a legitimate
regulatory goal, but to suppress unpopular ideas or infor-
mation."   *Turner Broadcasting,* 512 U. S., at 641.  Take
medicine, for example.  "Doctors help patients make deeply
personal decisions, and their candor is crucial."   *Woll-
schlaeger* v. *Governor of Florida*, 848 F. 3d 1293, 1328
(CA11  2017)  (en  banc)  (W. Pryor,  J.  concurring).
Throughout history, governments have "manipulat[ed] the
content of doctor-patient discourse" to increase state power
and suppress minorities:

> "For example, during the Cultural Revolution, Chi-
> nese physicians were dispatched to the countryside to
> convince peasants to use contraception.  In the 1930s,
> the Soviet government expedited completion of a con-
> struction project on the Siberian railroad by ordering
> doctors to both reject requests for medical leave from
> work and conceal this government order from their

patients. In Nazi Germany, the Third Reich system-
atically violated the separation between state ideology
and medical discourse. German physicians were
taught that they owed a higher duty to the 'health of
the Volk' than to the health of individual patients.
Recently, Nicolae Ceausescu's strategy to increase the
Romanian birth rate included prohibitions against
giving advice to patients about the use of birth control
devices and disseminating information about the use
of condoms as a means of preventing the transmission
of AIDS." Berg, Toward a First Amendment Theory of
Doctor-Patient Discourse and the Right To Receive
Unbiased Medical Advice, 74 B. U. L. Rev. 201, 201–
202 (1994) (footnotes omitted).

Further, when the government polices the content of
professional speech, it can fail to "'preserve an uninhibited
marketplace of ideas in which truth will ultimately pre-
vail.'" *McCullen* v. *Coakley*, 573 U. S. ___, ___–___ (2014)
(slip op., at 8–9). Professionals might have a host of good-
faith disagreements, both with each other and with the
government, on many topics in their respective fields.
Doctors and nurses might disagree about the ethics of
assisted suicide or the benefits of medical marijuana;
lawyers and marriage counselors might disagree about the
prudence of prenuptial agreements or the wisdom of di-
vorce; bankers and accountants might disagree about the
amount of money that should be devoted to savings or the
benefits of tax reform. "[T]he best test of truth is the
power of the thought to get itself accepted in the competi-
tion of the market," *Abrams* v. *United States*, 250 U. S.
616, 630 (1919) (Holmes, J., dissenting), and the people
lose when the government is the one deciding which ideas
should prevail.

"Professional speech" is also a difficult category to define
with precision. See *Entertainment Merchants Assn.*, 564

U. S., at 791. As defined by the courts of appeals, the professional-speech doctrine would cover a wide array of individuals—doctors, lawyers, nurses, physical therapists, truck drivers, bartenders, barbers, and many others. See Smolla, Professional Speech and the First Amendment, 119 W. Va. L. Rev. 67, 68 (2016). One court of appeals has even applied it to fortune tellers. See *Moore-King*, 708 F. 3d, at 569. All that is required to make something a "profession," according to these courts, is that it involves personalized services and requires a professional license from the State. But that gives the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement. States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose "invidious discrimination of disfavored subjects." *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 423–424, n. 19 (1993); see also *Riley*, 487 U. S., at 796 ("[S]tate labels cannot be dispositive of [the] degree of First Amendment protection" (citing *Bigelow* v. *Virginia*, 421 U. S. 809, 826 (1975)).

                              C

In sum, neither California nor the Ninth Circuit has identified a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles. We do not foreclose the possibility that some such reason exists. We need not do so because the licensed notice cannot survive even inter-mediate scrutiny. California asserts a single interest to justify the licensed notice: providing low-income women with information about state-sponsored services. Assum-ing that this is a substantial state interest, the licensed notice is not sufficiently drawn to achieve it.

If California's goal is to educate low-income women about the services it provides, then the licensed notice is

"wildly underinclusive." *Entertainment Merchants Assn.*, *supra*, at 802. The notice applies only to clinics that have a "primary purpose" of "providing family planning or pregnancy-related services" and that provide two of six categories of specific services. §123471(a). Other clinics that have another primary purpose, or that provide only one category of those services, also serve low-income women and could educate them about the State's services. According to the legislative record, California has "nearly 1,000 community clinics"—including "federally designated community health centers, migrant health centers, rural health centers, and frontier health centers"—that "serv[e] more than 5.6 million patients . . . annually through over 17 million patient encounters." App. 58. But most of those clinics are excluded from the licensed notice requirement without explanation. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Entertainment Merchants Assn.*, 564 U. S., at 802.

The FACT Act also excludes, without explanation, federal clinics and Family PACT providers from the licensed-notice requirement. California notes that those clinics can enroll women in California's programs themselves, but California's stated interest is informing women that these services exist in the first place. California has identified no evidence that the exempted clinics are more likely to provide this information than the covered clinics. In fact, the exempted clinics have long been able to enroll women in California's programs, but the FACT Act was premised on the notion that "thousands of women remain unaware of [them]." Cal. Legis. Serv., §1(b). If the goal is to maximize women's awareness of these programs, then it would seem that California would ensure that the places that can immediately enroll women also provide this information. The FACT Act's exemption for these clinics, which serve

many women who are pregnant or could become pregnant in the future, demonstrates the disconnect between its stated purpose and its actual scope. Yet "[p]recision . . . must be the touchstone" when it comes to regulations of speech, which "so closely touc[h] our most precious freedoms." *Button*, 371 U. S., at 438.

Further, California could inform low-income women about its services "without burdening a speaker with unwanted speech." *Riley*, 487 U. S., at 800. Most obviously, it could inform the women itself with a public-information campaign. See *ibid.* (concluding that a compelled disclosure was unconstitutional because the government could "itself publish . . . the disclosure"). California could even post the information on public property near crisis pregnancy centers. California argues that it has already tried an advertising campaign, and that many women who are eligible for publicly-funded healthcare have not enrolled. But California has identified no evidence to that effect. And regardless, a "tepid response" does not prove that an advertising campaign is not a sufficient alternative. *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 816 (2000). Here, for example, individuals might not have enrolled in California's services because they do not want them, or because California spent insufficient resources on the advertising campaign. Either way, California cannot co-opt the licensed facilities to deliver its message for it. "[T]he First Amendment does not permit the State to sacrifice speech for efficiency." *Riley*, *supra*, at 795; accord, *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721, 747 (2011).

In short, petitioners are likely to succeed on the merits of their challenge to the licensed notice. Contrary to the suggestion in the dissent, *post*, at 3–4 (opinion of BREYER, J.), we do not question the legality of health and safety warnings long considered permissible, or purely factual

and uncontroversial disclosures about commercial products.

## III

We next address the unlicensed notice. The parties dispute whether the unlicensed notice is subject to deferential review under *Zauderer*.[3] We need not decide whether the *Zauderer* standard applies to the unlicensed notice. Even under *Zauderer*, a disclosure requirement cannot be "unjustified or unduly burdensome." 471 U. S., at 651. Our precedents require disclosures to remedy a harm that is "potentially real not purely hypothetical," *Ibanez* v. *Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, 512 U. S. 136, 146 (1994), and to extend "no broader than reasonably necessary," *In re R. M. J.*, 455 U. S. 191, 203 (1982); accord, *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 772, n. 24 (1976); *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 384 (1977); cf. *Zauderer*, 471 U. S., at 649 (rejecting "broad prophylactic rules" in this area). Otherwise, they risk "chilling" protected speech." *Id.,* at 651. Importantly, California has the burden to prove that the unlicensed notice is neither unjustified nor unduly burdensome. See *Ibanez*, 512 U. S., at 146. It has not met its burden.

We need not decide what type of state interest is sufficient to sustain a disclosure requirement like the unlicensed notice. California has not demonstrated any justification for the unlicensed notice that is more than "purely hypothetical." *Ibid.* The only justification that the California Legislature put forward was ensuring that "pregnant women in California know when they are getting

_____

[3] Other than a conclusory assertion that the unlicensed notice satisfies any standard of review, see Brief for Respondents 19, California does not explain how the unlicensed notice could satisfy any standard other than *Zauderer*.

medical care from licensed professionals." 2015 Cal. Legis. Serv., §1(e). At oral argument, however, California denied that the justification for the FACT Act was that women "go into [crisis pregnancy centers] and they don't realize what they are." See Tr. of Oral Arg. at 44–45. Indeed, California points to nothing suggesting that pregnant women do not already know that the covered facilities are staffed by unlicensed medical professionals. The services that trigger the unlicensed notice—such as having "volunteers who collect health information from clients," "advertis[ing] . . . pregnancy options counseling," and offering over-the-counter "pregnancy testing," §123471(b)—do not require a medical license. And California already makes it a crime for individuals without a medical license to practice medicine. See Cal. Bus. & Prof. Code Ann. §2052. At this preliminary stage of the litigation, we agree that petitioners are likely to prevail on the question whether California has proved a justification for the unlicensed notice.[4]

Even if California had presented a nonhypothetical justification for the unlicensed notice, the FACT Act unduly burdens protected speech. The unlicensed notice imposes a government-scripted, speaker-based disclosure requirement that is wholly disconnected from California's informational interest. It requires covered facilities to post California's precise notice, no matter what the facilities say on site or in their advertisements. And it covers a curiously narrow subset of speakers. While the licensed notice applies to facilities that provide "family planning" services and "contraception or contraceptive methods," §123471(a), the California Legislature dropped these triggering conditions for the unlicensed notice. The unli-

—————

[4] Nothing in our opinion should be read to foreclose the possibility that California will gather enough evidence in later stages of this litigation.

censed notice applies only to facilities that primarily provide "pregnancy-related" services. §123471(b). Thus, a facility that advertises and provides pregnancy tests is covered by the unlicensed notice, but a facility across the street that advertises and provides nonprescription contraceptives is excluded—even though the latter is no less likely to make women think it is licensed. This Court's precedents are deeply skeptical of laws that "distinguis[h] among different speakers, allowing speech by some but not others." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 340 (2010). Speaker-based laws run the risk that "the State has left unburdened those speakers whose messages are in accord with its own views." *Sorrell*, 564 U. S., at 580.

The application of the unlicensed notice to advertisements demonstrates just how burdensome it is. The notice applies to all "print and digital advertising materials" by an unlicensed covered facility. §123472(b). These materials must include a government-drafted statement that "[t]his facility is not licensed as a medical facility by the State of California and has no licensed medical provider who provides or directly supervises the provision of services." §123472(b)(1). An unlicensed facility must call attention to the notice, instead of its own message, by some method such as larger text or contrasting type or color. See §§123472(b)(2)–(3). This scripted language must be posted in English and as many other languages as California chooses to require. As California conceded at oral argument, a billboard for an unlicensed facility that says "Choose Life" would have to surround that two-word statement with a 29-word statement from the government, in as many as 13 different languages. In this way, the unlicensed notice drowns out the facility's own message. More likely, the "detail required" by the unlicensed notice "effectively rules out" the possibility of having such a billboard in the first place. *Ibanez*, *supra*, at 146.

For all these reasons, the unlicensed notice does not satisfy *Zauderer*, assuming that standard applies. California has offered no justification that the notice plausibly furthers. It targets speakers, not speech, and imposes an unduly burdensome disclosure requirement that will chill their protected speech. Taking all these circumstances together, we conclude that the unlicensed notice is unjustified and unduly burdensome under *Zauderer*. We express no view on the legality of a similar disclosure requirement that is better supported or less burdensome.

## IV

We hold that petitioners are likely to succeed on the merits of their claim that the FACT Act violates the First Amendment. We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1140

_____

## NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, DBA NIFLA, ET AL., PETITIONERS *v.* XAVIER BECERRA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE ALITO, and JUSTICE GORSUCH join, concurring.

I join the Court's opinion in all respects.

This separate writing seeks to underscore that the apparent viewpoint discrimination here is a matter of serious constitutional concern. See *ante*, at 6, n. 2. The Court, in my view, is correct not to reach this question. It was not sufficiently developed, and the rationale for the Court's decision today suffices to resolve the case. And had the Court's analysis been confined to viewpoint discrimination, some legislators might have inferred that if the law were reenacted with a broader base and broader coverage it then would be upheld.

It does appear that viewpoint discrimination is inherent in the design and structure of this Act. This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression. For here the State requires primarily pro-life pregnancy centers to promote the State's own preferred message advertising abortions. This compels individuals to contradict their most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts, or all of these.

And the history of the Act's passage and its underinclusive application suggest a real possibility that these individuals were targeted because of their beliefs.

The California Legislature included in its official history the congratulatory statement that the Act was part of California's legacy of "forward thinking." App. 38–39. But it is not forward thinking to force individuals to "be an instrument for fostering public adherence to an ideological point of view [they] fin[d] unacceptable." *Wooley* v. *Maynard*, 430 U. S. 705, 715 (1977). It is forward thinking to begin by reading the First Amendment as ratified in 1791; to understand the history of authoritarian government as the Founders then knew it; to confirm that history since then shows how relentless authoritarian regimes are in their attempts to stifle free speech; and to carry those lessons onward as we seek to preserve and teach the necessity of freedom of speech for the generations to come. Governments must not be allowed to force persons to express a message contrary to their deepest convictions. Freedom of speech secures freedom of thought and belief. This law imperils those liberties.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1140

_____

## NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, DBA NIFLA, ET AL., PETITIONERS *v.* XAVIER BECERRA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The petitioners ask us to consider whether two sections of a California statute violate the First Amendment. The first section requires licensed medical facilities (that provide women with assistance involving pregnancy or family planning) to tell those women where they might obtain help, including financial help, with comprehensive family planning services, prenatal care, and abortion. The second requires *un*licensed facilities offering somewhat similar services to make clear that they are unlicensed. In my view both statutory sections are likely constitutional, and I dissent from the Court's contrary conclusions.

I

The first statutory section applies to licensed medical facilities dealing with pregnancy and which also provide specific services such as prenatal care, contraception counseling, pregnancy diagnosis, or abortion-related services. Cal. Health & Safety Code Ann. §§123471(a), 1204, 1206(h) (West 2018) (covering "primary care clinics" that serve low-income women); Cal. Code Regs., tit. 22, §75026 (2018) ("primary care clinics" are medical facilities that

provide "services for the care and treatment of patients for whom the clinic accepts responsibility" with the "direction or supervision" of each "service" undertaken "by a person licensed, certified or registered to provide such service").

The statute requires these facilities to post a notice in their waiting rooms telling their patients:

> "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women.  To determine whether you qualify, contact the county social services office at [insert the telephone number]."  §123472(a)(1).

The petitioners here, a group of covered medical facilities that object to abortion for religious reasons, brought this case seeking an injunction against enforcement of the California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act on the ground that it violates the First Amendment on its face.  The District Court denied a preliminary injunction, and the Court of Appeals affirmed.  The majority now reverses the Court of Appeals on the ground that the petitioners have shown a likelihood of success on the merits, *i.e.*, that the statute likely violates the petitioners' free speech rights and is unconstitutional on its face.

### A

Before turning to the specific law before us, I focus upon the general interpretation of the First Amendment that the majority says it applies.  It applies heightened scrutiny to the Act because the Act, in its view, is "content based."  *Ante,* at 6–7.  "By compelling individuals to speak a particular message," it adds, "such notices 'alte[r] the content of [their] speech.'"  *Ante,* at 7 (quoting *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781,

795 (1988)) (alteration in original). "As a general matter," the majority concludes, such laws are "presumptively unconstitutional" and are subject to "stringent" review. *Ante,* at 6–7.

The majority recognizes exceptions to this general rule: It excepts laws that "require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" *provided that* the disclosure "relates to the services that [the regulated entities] provide." *Ante,* at 8–9. It also excepts laws that "regulate professional conduct" *and* only "incidentally burden speech." *Ante,* at 9–10.

This constitutional approach threatens to create serious problems. Because much, perhaps most, human behavior takes place through speech and because much, perhaps most, law regulates that speech in terms of its content, the majority's approach at the least threatens considerable litigation over the constitutional validity of much, perhaps most, government regulation. Virtually every disclosure law could be considered "content based," for virtually every disclosure law requires individuals "to speak a particular message." See *Reed* v. *Town of Gilbert*, 576 U. S. \_\_\_, \_\_\_ (2015) (BREYER, J., concurring in judgment) (slip op., at 3) (listing regulations that inevitably involve content discrimination, ranging from securities disclosures to signs at petting zoos). Thus, the majority's view, if taken literally, could radically change prior law, perhaps placing much securities law or consumer protection law at constitutional risk, depending on how broadly its exceptions are interpreted.

Many ordinary disclosure laws would fall outside the majority's exceptions for disclosures related to the professional's own services or conduct. These include numerous commonly found disclosure requirements relating to the medical profession. See, *e.g.*, Cal. Veh. Code Ann. §27363.5 (West 2014) (requiring hospitals to tell parents about child seat belts); Cal. Health & Safety Code Ann.

§123222.2 (requiring hospitals to ask incoming patients if they would like the facility to give their family information about patients' rights and responsibilities); N. C. Gen. Stat. Ann. §131E–79.2 (2017) (requiring hospitals to tell parents of newborns about pertussis disease and the available vaccine). These also include numerous disclosure requirements found in other areas. See, *e.g.,* N. Y. C. Rules & Regs., tit. 1, §27–01 (2018) (requiring signs by elevators showing stair locations); San Francisco Dept. of Health, Director's Rules & Regs., Garbage and Refuse (July 8, 2010) (requiring property owners to inform tenants about garbage disposal procedures).

The majority, at the end of Part II of its opinion, perhaps recognizing this problem, adds a general disclaimer. It says that it does not "question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Ante,* at 16–17. But this generally phrased disclaimer would seem more likely to invite litigation than to provide needed limitation and clarification. The majority, for example, does not explain why the Act here, which is justified in part by health and safety considerations, does not fall within its "health" category. *Ante,* at 14; see also *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 882–884 (1992) (joint opinion of O'Connor, KENNEDY, and Souter, JJ.) (reasoning that disclosures related to fetal development and childbirth are related to the health of a woman seeking an abortion). Nor does the majority opinion offer any reasoned basis that might help apply its disclaimer for distinguishing lawful from unlawful disclosures. In the absence of a reasoned explanation of the disclaimer's meaning and rationale, the disclaimer is unlikely to withdraw the invitation to litigation that the majority's general broad "content-based" test issues. That test invites courts around the Nation to apply an unpredictable First Amendment to ordinary social and economic

regulation, striking down disclosure laws that judges may disfavor, while upholding others, all without grounding their decisions in reasoned principle.

Notably, the majority says nothing about limiting its language to the kind of instance where the Court has traditionally found the First Amendment wary of content-based laws, namely, in cases of viewpoint discrimination. "Content-based laws merit this protection because they present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint." *Reed,* 576 U. S., at \_\_\_ (ALITO, J., concurring) (slip op., at 1). Accordingly, "[l]imiting speech based on its 'topic' or 'subject'" can favor "those who do not want to disturb the status quo." *Ibid.* But the mine run of disclosure requirements do nothing of that sort. They simply alert the public about child seat belt laws, the location of stairways, and the process to have their garbage collected, among other things.

Precedent does not require a test such as the majority's. Rather, in saying the Act is not a longstanding health and safety law, the Court substitutes its own approach—without a defining standard—for an approach that was reasonably clear. Historically, the Court has been wary of claims that regulation of business activity, particularly health-related activity, violates the Constitution. Ever since this Court departed from the approach it set forth in *Lochner* v. *New York*, 198 U. S. 45 (1905), ordinary economic and social legislation has been thought to raise little constitutional concern. As Justice Brandeis wrote, typically this Court's function in such cases "is only to determine the reasonableness of the Legislature's belief in the existence of evils and in the effectiveness of the remedy provided." *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 286–287 (1932) (dissenting opinion); see *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 486–488 (1955) (adopting the approach of Justice Brandeis).

   The Court has taken this same respectful approach to
economic and social legislation when a First Amendment
claim like the claim present here is at issue.  See, *e.g.,
Zauderer* v. *Office of Disciplinary Counsel of Supreme
Court of Ohio*, 471 U. S. 626, 651 (1985) (upholding rea-
sonable disclosure requirements for attorneys); *Milavetz,
Gallop & Milavetz, P. A.* v. *United States*, 559 U. S. 229,
252–253 (2010) (same); cf. *Central Hudson Gas & Elec.
Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 563–
564 (1980) (applying intermediate scrutiny to other re-
strictions on commercial speech); *In re R. M. J.*, 455 U. S.
191, 203 (1982) (no First Amendment protection for mis-
leading or deceptive commercial speech).  But see *Sorrell*
v. *IMS Health Inc.*, 564 U. S. 552 (2011) (striking down
regulation of pharmaceutical drug-related information).

   Even during the *Lochner* era, when this Court struck
down numerous economic regulations concerning industry,
this Court was careful to defer to state legislative judg-
ments concerning the medical profession.  The Court took
the view that a State may condition the practice of medi-
cine on any number of requirements, and physicians, in
exchange for following those reasonable requirements,
could receive a license to practice medicine from the State.
Medical professionals do not, generally speaking, have a
right to use the Constitution as a weapon allowing them
rigorously to control the content of those reasonable condi-
tions.  See, *e.g., Dent* v. *West Virginia*, 129 U. S. 114 (1889)
(upholding medical licensing requirements); *Hawker* v.
*New York*, 170 U. S. 189 (1898) (same); *Collins* v. *Texas*,
223 U. S. 288, 297–298 (1912) (recognizing the "right of
the State to adopt a policy even upon medical matters
concerning which there is difference of opinion and dis-
pute"); *Lambert* v. *Yellowley*, 272 U. S. 581, 596 (1926)
("[T]here is no right to practice medicine which is not
subordinate to the police power of the States"); *Graves* v.
*Minnesota*, 272 U. S. 425, 429 (1926) (statutes "regulating

the practice of medicine" involve "very different considerations" from those applicable to "trades [such as] locomotive engineers and barbers"); *Semler* v. *Oregon Bd. of Dental Examiners*, 294 U. S. 608, 612 (1935) (upholding state regulation of dentistry given the "vital interest of public health"). In the name of the First Amendment, the majority today treads into territory where the pre-New Deal, as well as the post-New Deal, Court refused to go.

The Court, in justification, refers to widely accepted First Amendment goals, such as the need to protect the Nation from laws that "'suppress unpopular ideas or information'" or inhibit the "'marketplace of ideas in which truth will ultimately prevail.'" *Ante*, at 12–13; see *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269 (1964). The concurrence highlights similar First Amendment interests. *Ante,* at 2. I, too, value this role that the First Amendment plays—in an appropriate case. But here, the majority enunciates a general test that reaches far beyond the area where this Court has examined laws closely in the service of those goals. And, in suggesting that heightened scrutiny applies to much economic and social legislation, the majority pays those First Amendment goals a serious disservice through dilution. Using the First Amendment to strike down economic and social laws that legislatures long would have thought themselves free to enact will, for the American public, obscure, not clarify, the true value of protecting freedom of speech.

## B

Still, what about this specific case? The disclosure at issue here concerns speech related to abortion. It involves health, differing moral values, and differing points of view. Thus, rather than set forth broad, new, First Amendment principles, I believe that we should focus more directly upon precedent more closely related to the case at hand. This Court has more than once considered disclosure laws

relating to reproductive health. Though those rules or holdings have changed over time, they should govern our disposition of this case.

I begin with *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416 (1983). In that case the Court considered a city ordinance requiring a doctor to tell a woman contemplating an abortion about the

> "status of her pregnancy, the development of her fetus, the date of possible viability, the physical and emotional complications that may result from an abortion, and the availability of agencies to provide her with assistance and information with respect to birth control, adoption, and childbirth[, and] . . . 'the particular risks associated with her own pregnancy and the abortion technique to be employed.'" *Id.,* at 442 (quoting Akron Codified Ordinances §1870.06(C) (1978)).

The ordinance further required a doctor to tell such a woman that "'the unborn child is a human life from the moment of conception.'" *Akron, supra,* at 444 (quoting Akron Codified Ordinances §1870.06(B)(3)).

The plaintiffs claimed that this ordinance violated a woman's constitutional right to obtain an abortion. And this Court agreed. The Court stated that laws providing for a woman's "informed consent" to an abortion were normally valid, for they helped to protect a woman's health. *Akron,* 462 U. S., at 443–444. Still, the Court held that the law at issue went "beyond permissible limits" because "much of the information required [was] designed not to inform the woman's consent but rather to persuade her to withhold it altogether." *Id.,* at 444. In the Court's view, the city had placed unreasonable "'obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision.'" *Id.,* at 445 (quoting *Whalen* v. *Roe*, 429 U. S. 589, 604, n. 33

(1977)) (alteration in original).

Several years later, in *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747 (1986), the Court considered a Pennsylvania statute that "prescribe[d] in detail the method for securing 'informed consent'" to an abortion. *Id.,* at 760. The statute required the doctor to tell the patient about health risks associated with abortion, possibly available benefits for prenatal care, childbirth, and neonatal care, and agencies offering alternatives to abortion. *Id.,* at 760–761. In particular it required the doctor to give the patient printed materials that, among other things, said:

> """There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or place her or him for adoption. The Commonwealth of Pennsylvania strongly urges you to contact them before making a final decision about abortion. The law requires that your physician or his agent give you the opportunity to call agencies like these before you undergo an abortion."'" *Id.,* at 761 (quoting 18 Pa. Cons. Stat. §3208(a)(1) (1982)).

The Court, as in *Akron*, held that the statute's information requirements violated the Constitution. They were designed "'not to inform the woman's consent but rather to persuade her to withhold it altogether.'" *Thornburgh, supra,* at 762 (quoting *Akron, supra,* at 444). In the Court's view, insistence on telling the patient about the availability of "medical assistance benefits" if she decided against an abortion was a "poorly disguised elemen[t] of discouragement for the abortion decision," and the law was the "antithesis of informed consent." *Thornburgh, supra*, at 763–764.

These cases, however, whatever support they may have

given to the majority's view, are no longer good law. In
*Planned Parenthood of Southeastern Pa.* v. *Casey*, 505
U. S. 833 (1992), the Court again considered a state law
that required doctors to provide information to a woman
deciding whether to proceed with an abortion. That law
required the doctor to tell the woman about the nature of
the abortion procedure, the health risks of abortion and of
childbirth, the "'probable gestational age of the unborn
child,'" and the availability of printed materials describing
the fetus, medical assistance for childbirth, potential child
support, and the agencies that would provide adoption
services (or other alternatives to abortion). *Id.,* at 881
(joint opinion of O'Connor, KENNEDY, and Souter, JJ.)
(quoting 18 Pa. Cons. Stat. §3205 (1990)).

This time a joint opinion of the Court, in judging whether
the State could impose these informational requirements,
asked whether doing so imposed an "undue burden" upon
women seeking an abortion. *Casey*, 505 U. S., at 882–883.
It held that it did not. *Ibid.* Hence the statute was consti-
tutional. *Id.,* at 874. The joint opinion stated that the
statutory requirements amounted to "reasonable meas-
ure[s] to ensure an informed choice, one which might
cause the woman to choose childbirth over abortion." *Id.,*
at 883. And, it "overruled" portions of the two cases,
*Akron* and *Thornburgh*, that might indicate the contrary.
*Id.,* at 882.

In respect to overruling the earlier cases, it wrote:

"To the extent *Akron I* and *Thornburgh* find a consti-
tutional violation when the government requires, as it
does here, the giving of truthful, nonmisleading in-
formation about the nature of the procedure, the at-
tendant health risks and those of childbirth, and the
'probable gestational age' of the fetus, those cases go
too far, are inconsistent with *Roe*'s acknowledgment of
an important interest in potential life, and are over-

ruled." *Ibid.*

The joint opinion specifically discussed the First Amendment, the constitutional provision now directly before us. It concluded that the statute did not violate the First Amendment. It wrote:

> "All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and child-birth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley* v. *Maynard*, 430 U. S. 705 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen* v. *Roe*, 429 U. S. 589, 603 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here." *Casey*, 505 U. S., at 884.

Thus, the Court considered the State's statutory requirements, including the requirement that the doctor must inform his patient about where she could learn how to have the newborn child adopted (if carried to term) and how she could find related financial assistance. *Id.,* at 881. To repeat the point, the Court then held that the State's requirements did *not* violate either the Constitution's protection of free speech or its protection of a woman's right to choose to have an abortion.

## C

Taking *Casey* as controlling, the law's demand for even-handedness requires a different answer than that perhaps suggested by *Akron* and *Thornburgh*. If a State can lawfully require a doctor to tell a woman seeking an abortion about adoption services, why should it not be able, as here, to require a medical counselor to tell a woman seeking

prenatal care or other reproductive healthcare about
childbirth and abortion services?  As the question sug-
gests, there is no convincing reason to distinguish between
information about adoption and information about abor-
tion in this context.  After all, the rule of law embodies
evenhandedness, and "what is sauce for the goose is nor-
mally sauce for the gander."  *Heffernan* v. *City of Paterson*,
578 U. S. ___, ___ (2016) (slip op., at 6).

1

The majority tries to distinguish *Casey* as concerning a
regulation of professional conduct that only incidentally
burdened speech.  *Ante,* at 10–11.  *Casey*, in its view,
applies only when obtaining "informed consent" to a medi-
cal procedure is directly at issue.

This distinction, however, lacks moral, practical, and
legal force.  The individuals at issue here are all medical
personnel engaging in activities that directly affect a
woman's health—not significantly different from the
doctors at issue in *Casey*.  After all, the statute here ap-
plies only to "primary care clinics," which provide "services
for the care and treatment of patients for whom the clinic
accepts responsibility."  Cal. Code Regs., tit. 22, §75026(a);
see Cal. Health & Safety Code Ann. §§123471(a), 1204,
1206(h).  And the persons responsible for patients at those
clinics are all persons "licensed, certified or registered to
provide" pregnancy-related medical services.  Cal. Code
Regs., tit. 22, §75026(c).  The petitioners have not, either
here or in the District Court, provided any example of a
covered clinic that is not operated by licensed doctors or
what the statute specifies are equivalent professionals.
See, *e.g.*, App. to Pet. for Cert. 92a (identifying two obste-
trician/gynecologists, a radiologist, an anesthesiologist, a
certified nurse midwife, a nurse practitioner, 10 nurses,
and two registered diagnostic medical sonographers on
staff).

The Act requires these medical professionals to disclose information about the possibility of abortion (including potential financial help) that is as likely helpful to granting "informed consent" as is information about the possibility of adoption and childbirth (including potential financial help). That is why I find it impossible to drive any meaningful legal wedge between the law, as interpreted in *Casey*, and the law as it should be applied in this case. If the law in *Casey* regulated speech "only 'as part of the *practice* of medicine,'" *ante,* at 11 (quoting *Casey*, *supra,* at 884), so too here.

The majority contends that the disclosure here is unrelated to a "medical procedure," unlike that in *Casey*, and so the State has no reason to inform a woman about alternatives to childbirth (or, presumably, the health risks of childbirth). *Ante,* at 11. Really? No one doubts that choosing an abortion is a medical procedure that involves certain health risks. See *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, ___ (2016) (slip op., at 30) (identifying the mortality rate in Texas as 1 in 120,000 to 144,000 abortions). But the same is true of carrying a child to term and giving birth. That is why prenatal care often involves testing for anemia, infections, measles, chicken pox, genetic disorders, diabetes, pneumonia, urinary tract infections, preeclampsia, and hosts of other medical conditions. Childbirth itself, directly or through pain management, risks harms of various kinds, some connected with caesarean or surgery-related deliveries, some related to more ordinary methods of delivery. Indeed, nationwide "childbirth is 14 times more likely than abortion to result in" the woman's death. *Ibid.* Health considerations do not favor disclosure of alternatives and risks associated with the latter but not those associated with the former.

In any case, informed consent principles apply more broadly than only to discrete "medical procedures." Prescription drug labels warn patients of risks even though

taking prescription drugs may not be considered a "medical procedure." 21 CFR §201.56 (2017). In California, clinics that screen for breast cancer must post a sign in their offices notifying patients that, if they are diagnosed with breast cancer, their doctor must provide "a written summary of alternative efficacious methods of treatment," a notification that does not relate to the *screening* procedure at issue. Cal. Health & Safety Code Ann. §109277. If even these disclosures fall outside the majority's cramped view of *Casey* and informed consent, it undoubtedly would invalidate the many other disclosures that are routine in the medical context as well. *Supra,* at 3–4.

The majority also finds it "[t]ellin[g]" that general practice clinics—*i.e.,* paid clinics—are not required to provide the licensed notice. *Ante,* at 11. But the lack-of-information problem that the statute seeks to ameliorate is a problem that the State explains is commonly found among low-income women. See Brief for State Respondents 5–6. That those with low income might lack the time to become fully informed and that this circumstance might prove disproportionately correlated with income is not intuitively surprising. Nor is it surprising that those with low income, whatever they choose in respect to pregnancy, might find information about financial assistance particularly useful. There is "nothing inherently suspect" about this distinction, *McCullen* v. *Coakley*, 573 U. S. ___, ___ (2014) (slip op., at 15), which is not "based on the content of [the advocacy] each group offers," *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 658–659 (1994), but upon the patients the group generally serves and the needs of that population.

2

Separately, finding no First Amendment infirmity in the licensed notice is consistent with earlier Court rulings. For instance, in *Zauderer* we upheld a requirement that

attorneys disclose in their advertisements that clients might be liable for significant litigation costs even if their lawsuits were unsuccessful. 471 U. S., at 650. We refused to apply heightened scrutiny, instead asking whether the disclosure requirements were "reasonably related to the State's interest in preventing deception of consumers." *Id.,* at 651.

The majority concludes that *Zauderer* does not apply because the disclosure "in no way relates to the services that licensed clinics provide." *Ante,* at 9. But information about state resources for family planning, prenatal care, and abortion *is* related to the services that licensed clinics provide. These clinics provide counseling about contraception (which is a family-planning service), ultrasounds or pregnancy testing (which is prenatal care), or abortion. Cal. Health & Safety Code Ann. §123471(a). The required disclosure is related to the clinic's services because it provides information about state resources for the very same services. A patient who knows that she can receive free prenatal care from the State may well prefer to forgo the prenatal care offered at one of the clinics here. And for those interested in family planning and abortion services, information about such alternatives is relevant information to patients offered prenatal care, just as *Casey* considered information about adoption to be relevant to the abortion decision.

Regardless, *Zauderer* is not so limited. *Zauderer* turned on the "material differences between disclosure requirements and outright prohibitions on speech." 471 U. S., at 650. A disclosure requirement does not prevent speakers "from conveying information to the public," but "only require[s] them to provide somewhat more information than they might otherwise be inclined to present." *Ibid.* Where a State's requirement to speak "purely factual and uncontroversial information" does not attempt "to 'prescribe what shall be orthodox in politics, nationalism,

religion, or other matters of opinion or force citizens to confess by word or act their faith therein,'" it does not warrant heightened scrutiny. *Id.,* at 651 (quoting *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 642 (1943)).

In *Zauderer,* the Court emphasized the reason that the First Amendment protects commercial speech at all: "the value to consumers of the information such speech provides." 471 U. S., at 651. For that reason, a professional's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." *Ibid.* But this rationale is not in any way tied to advertisements about a professional's own services. For instance, it applies equally to a law that requires doctors, when discharging a child under eight years of age, to "provide to and discuss with the parents . . . information on the current law requiring child passenger restraint systems, safety belts, and the transportation of children in rear seats." Cal. Veh. Code Ann. §27363.5(a). Even though child seat belt laws do not directly relate to the doctor's own services, telling parents about such laws does nothing to undermine the flow of factual information. Whether the context is advertising the professional's own services or other commercial speech, a doctor's First Amendment interest in not providing factual information to patients is the same: minimal, because his professional speech is protected precisely because of its informational value to patients. There is no reason to subject such laws to heightened scrutiny.

Accordingly, the majority's reliance on cases that prohibit rather than require speech is misplaced. *Ante,* at 12–14. I agree that "'in the fields of medicine and public heath, . . . information can save lives,'" but the licensed disclosure *serves* that informational interest by requiring clinics to notify patients of the availability of state resources for family planning services, prenatal care, and abortion, which—unlike the majority's examples of norma-

tive statements, *ante,* at 13—is truthful and nonmislead-
ing information. Abortion is a controversial topic and a
source of normative debate, but the availability of state
resources is not a normative statement or a fact of debat-
able truth. The disclosure includes information about
resources available should a woman seek to continue her
pregnancy or terminate it, and it expresses no official
preference for one choice over the other. Similarly, the
majority highlights an interest that often underlies our
decisions in respect to speech prohibitions—the market-
place of ideas. But that marketplace is fostered, not hin-
dered, by providing information to patients to enable them
to make fully informed medical decisions in respect to
their pregnancies.

Of course, one might take the majority's decision to
mean that speech about abortion is special, that it involves
in this case not only professional medical matters, but also
views based on deeply held religious and moral beliefs
about the nature of the practice. To that extent, arguably,
the speech here is different from that at issue in *Zauderer*.
But assuming that is so, the law's insistence upon treating
like cases alike should lead us to reject the petitioners'
arguments that I have discussed. This insistence, the
need for evenhandedness, should prove particularly
weighty in a case involving abortion rights. That is be-
cause Americans hold strong, and differing, views about
the matter. Some Americans believe that abortion in-
volves the death of a live and innocent human being.
Others believe that the ability to choose an abortion is
"central to personal dignity and autonomy," *Casey*, 505
U. S., at 851, and note that the failure to allow women to
choose an abortion involves the deaths of innocent women.
We have previously noted that we cannot try to adjudicate
who is right and who is wrong in this moral debate. But
we can do our best to interpret American constitutional
law so that it applies fairly within a Nation whose citizens

strongly hold these different points of view. That is one reason why it is particularly important to interpret the First Amendment so that it applies evenhandedly as between those who disagree so strongly. For this reason too a Constitution that allows States to insist that medical providers tell women about the possibility of adoption should also allow States similarly to insist that medical providers tell women about the possibility of abortion.

D

It is particularly unfortunate that the majority, through application of so broad and obscure a standard, see *supra*, at 2–7, declines to reach remaining arguments that the Act discriminates on the basis of viewpoint. *Ante,* at 6, n. 2. The petitioners argue that it unconstitutionally discriminates on the basis of viewpoint because it primarily covers facilities with supporters, organizers, and employees who are likely to hold strong pro-life views. They contend that the statute does not cover facilities likely to hold neutral or pro-choice views, because it exempts facilities that enroll patients in publicly funded programs that include abortion. In doing so, they say, the statute unnecessarily imposes a disproportionate burden upon facilities with pro-life views, the very facilities most likely to find the statute's references to abortion morally abhorrent. Brief for Petitioners 31–37.

The problem with this argument lies in the record. Numerous *amicus* briefs advance the argument. See, *e.g.,* Brief for Scharpen Foundation, Inc., et al. as *Amici Curiae* 6–10; Brief for American Center for Law & Justice et al. as *Amici Curiae* 7–13. Some add that women who use facilities that are exempt from the statute's requirements (because they enroll patients in two California state-run medical programs that provide abortions) may still need the information provided by the disclosure, Brief for CATO Institute as *Amicus Curiae* 15, a point the majority adopts

in concluding that the Act is underinclusive, *ante,* at 15–
16. But the key question is whether these exempt clinics
are significantly more likely than are the pro-life clinics to
tell or to have told their pregnant patients about the
existence of these programs—in the absence of any statu-
tory compulsion. If so, it may make sense—in terms of the
statute's informational objective—to exempt them, namely
if there is no need to cover them. See FACT Act, §1(d)
(suggesting in general terms that this is so). But, if there
are not good reasons to exempt these clinics from cover-
age, *i.e.,* if, for example, they too frequently do not tell
their patients about the availability of abortion services,
the petitioners' claim of viewpoint discrimination becomes
much stronger.

The petitioners, however, did not develop this point in
the record below. They simply stated in their complaint
that the Act exempts "facilities which provide abortion
services, freeing them from the Act's disclosure require-
ments, while leaving pro-life facilities subject to them."
App. to Pet. for Cert. 104a. And in the District Court they
relied solely on the allegations of their complaint, provided
no supporting declarations, and contended that discovery
was unnecessary. *Id.,* at 47a, 50a, 68a. The District Court
concluded that the reason for the Act's exemptions was
that those clinics "provide the entire spectrum of services
required of the notice," and that absent discovery, "there is
no evidence to suggest the Act burdens only" pro-life con-
duct. *Id.,* at 68a. Similarly, the petitioners pressed the
claim in the Court of Appeals. *Id.,* at 20a–22a. But they
did not supplement the record. Consequently, that court
reached the same conclusion. Given the absence of evi-
dence in the record before the lower courts, the "viewpoint
discrimination" claim could not justify the issuance of a
preliminary injunction.

II

The second statutory provision covers pregnancy-related facilities that provide women with certain medical-type services (such as obstetric ultrasounds or sonograms, pregnancy diagnosis, counseling about pregnancy options, or prenatal care), are not licensed as medical facilities by the State, and do not have a licensed medical provider on site. Cal. Health & Safety Code Ann. §123471(b)(1). The statute says that such a facility must disclose that it is not "licensed as a medical facility." §123472(b). And it must make this disclosure in a posted notice and in advertising. *Ibid.*

The majority does not question that the State's interest (ensuring that "pregnant women in California know when they are getting medical care from licensed professionals") is the type of informational interest that *Zauderer* encompasses. *Ante,* at 5, 17. Nor could it. In *Riley,* 487 U. S. 781, the Court noted that the First Amendment would permit a requirement for "professional fundraisers to disclose their professional status"—nearly identical to the unlicensed disclosure at issue here. *Id.,* at 799 and n. 11; see also *id.,* at 804 (Scalia, J., concurring in part and concurring in judgment) (noting that this requirement was not aimed at combating deception). Such informational interests have long justified regulations in the medical context. See, *e.g., Dent,* 129 U. S., at 122 (upholding medical licensing requirements that "tend to secure [a State's citizens] against the consequences of ignorance and incapacity, as well as of deception and fraud"); *Semler,* 294 U. S., at 611 (upholding state dentistry regulation that "afford[ed] protection against ignorance, incapacity and imposition").

Nevertheless, the majority concludes that the State's interest is "purely hypothetical" because unlicensed clinics provide innocuous services that do not require a medical license. *Ante,* at 17–18. To do so, it applies a searching

standard of review based on our precedents that deal with speech *restrictions*, not *disclosures*. *Ante,* at 17 (citing, *e.g., In re R. M. J.*, 455 U. S., at 203; *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 772, n. 24 (1976); *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 384 (1977); and *Zauderer*, 471 U. S., at 649 (portion of opinion considering speech restrictions, not disclosures)). This approach is incompatible with *Zauderer*. See *Zauderer*, *supra*, at 651 (upholding attorney disclosure requirements where "reasonably related to the State's interest"); *Milavetz*, 559 U. S., at 250–253 (same).

There is no basis for finding the State's interest "hypothetical." The legislature heard that information-related delays in qualified healthcare negatively affect women seeking to terminate their pregnancies as well as women carrying their pregnancies to term, with delays in qualified prenatal care causing life-long health problems for infants. Reproductive FACT Act: Hearing on Assembly B. 775 before the Senate Health Committee, 2015 Cal. Leg. Sess. Even without such testimony, it is "self-evident" that patients might think they are receiving qualified medical care when they enter facilities that collect health information, perform obstetric ultrasounds or sonograms, diagnose pregnancy, and provide counseling about pregnancy options or other prenatal care. *Milavetz*, *supra*, at 251. The State's conclusion to that effect is certainly reasonable.

The majority also suggests that the Act applies too broadly, namely, to all unlicensed facilities "no matter what the facilities say on site or in their advertisements." *Ante,* at 18. But the Court has long held that a law is not unreasonable merely because it is overinclusive. For instance, in *Semler* the Court upheld as reasonable a state law that prohibited licensed dentists from advertising that their skills were superior to those of other dentists. 294 U. S., at 609. A dentist complained that he was, in fact,

better than other dentists. *Id.,* at 610. Yet the Court held that "[i]n framing its policy, the legislature was not bound to provide for determinations of the relative proficiency of particular practitioners." *Id.,* at 612. To the contrary, "[t]he legislature was entitled to consider the general effects of the practices which it described, and if these effects were injurious in facilitating unwarranted and misleading claims, to counteract them by a general rule, even though in particular instances there might be no actual deception or misstatement." *Id.,* at 613.

Relatedly, the majority suggests that the Act is suspect because it covers some speakers but not others. *Ante,* at 18–19. I agree that a law's exemptions can reveal viewpoint discrimination (although the majority does not reach this point). "'[A]n exemption from an otherwise permissible regulation of speech may represent a governmental "attempt to give one side of a debatable public question an advantage in expressing its views to the people."'" *McCullen*, 573 U. S., at \_\_\_ (slip op., at 15) (quoting *City of Ladue* v. *Gilleo*, 512 U. S. 43, 51 (1994)). Such speaker-based laws warrant heightened scrutiny "when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broadcasting System, Inc.*, 512 U. S., at 658. Accordingly, where a law's exemptions "facilitate speech on only one side of the abortion debate," there is a "clear form of viewpoint discrimination." *McCullen, supra,* at \_\_\_ (slip op., at 18).

There is no cause for such concern here. The Act does not, on its face, distinguish between facilities that favor pro-life and those that favor pro-choice points of view. Nor is there any convincing evidence before us or in the courts below that discrimination was the purpose or the effect of the statute. Notably, California does not single out pregnancy-related facilities for this type of disclosure requirement. See, *e.g.,* Cal. Bus. & Prof. Code Ann. §2053.6 (West

2012) (unlicensed providers of alternative health services must disclose that "he or she is not a licensed physician" and "the services to be provided are not licensed by the state"). And it is unremarkable that the State excluded the provision of family planning and contraceptive services as triggering conditions. *Ante,* at 18–19. After all, the State was seeking to ensure that "pregnant women in California know when they are getting medical care from licensed professionals," and pregnant women generally do not need contraceptive services.

Finally, the majority concludes that the Act is overly burdensome. *Ante,* at 19. I agree that "unduly burdensome disclosure requirements might offend the First Amendment." *Zauderer*, 471 U. S., at 651. But these and similar claims are claims that the statute could be applied unconstitutionally, not that it is unconstitutional on its face. Compare *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 14 (1988) (a facial overbreadth challenge must show "from actual fact" that a "substantial number of instances exist in which the Law cannot be applied constitutionally"), with *Chicago* v. *Morales*, 527 U. S. 41, 74 (1999) (Scalia, J., dissenting) (an as-applied challenge asks whether "the statute is unconstitutional as applied to *this* party, in the circumstances of *this* case"). And it will be open to the petitioners to make these claims if and when the State threatens to enforce the statute in this way. But facial relief is inappropriate here, where the petitioners "fail" even "to describe [these] instances of arguable overbreadth of the contested law," *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 449–450, n. 6 (2008), where "[n]o record was made in this respect," and where the petitioners thus have not shown "from actual fact" that a "substantial number of instances exist in which the Law cannot be applied constitutionally," *New York State Club Assn.*, *supra*, at 14.

For instance, the majority highlights that the statute

requires facilities to write their "medical license" disclaimers in 13 languages. *Ante,* at 19. As I understand the Act, it would require disclosure in no more than two languages—English and Spanish—in the vast majority of California's 58 counties. The exception is Los Angeles County, where, given the large number of different-language speaking groups, expression in many languages may prove necessary to communicate the message to those whom that message will help. Whether the requirement of 13 different languages goes too far and is unnecessarily burdensome in light of the need to secure the statutory objectives is a matter that concerns Los Angeles County alone, and it is a proper subject for a Los Angeles-based as applied challenge in light of whatever facts a plaintiff finds relevant. At most, such facts might show a need for fewer languages, not invalidation of the statute.

*       *       *

For these reasons I would not hold the California statute unconstitutional on its face, I would not require the District Court to issue a preliminary injunction forbidding its enforcement, and I respectfully dissent from the majority's contrary conclusions.