STATE of Missouri, Appellant,

v.

Markland S. ROUSSEAU, Respondent.

No. WD 58158.

Missouri Court of Appeals,
Western District.

Dec. 26, 2000.

Rebecca Martin Rivers, Asst. Pros. Atty., Kansas City, for Appellant.

Thomas J. Bath, Jr., Overland Park, KS, for Respondent.

Before SPINDEN, C.J., and ULRICH and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

The State of Missouri appeals from the judgment of the Circuit Court of Jackson County dismissing the three-count felony indictment against the respondent, Mark-

land S. Rousseau, charging him with three instances of giving false testimony before the Missouri Gaming Commission (Commission) concerning his involvement in the development of a riverboat casino in Kansas City, Missouri, in violation of § 313.550.3.[1]

In its sole point on appeal, the State claims that the trial court erred in dismissing the indictment against the respondent as being fatally defective for failing to allege an essential element of the crime of giving false testimony before the Commission in violation of § 313.550.3, because, to establish such a violation, the court erroneously interpreted that section as requiring proof that the respondent gave false testimony before the Commission concerning horse racing, rather than excursion gambling boats.

We affirm.

### Facts

In November 1992, the Port Authority of Kansas City, Missouri, solicited offers from gaming companies interested in building a riverboat casino on one of two sites located within the city limits of Kansas City on property controlled by the Port Authority, designated as site A and site B. Three gaming companies, Promus Corporation (Promus), Boyd Gaming Corporation (Boyd), and Hilton Hotels Corporation (Hilton), responded to the Port Authority's solicitation.

In his capacity as vice president in charge of gaming development for Hilton, the respondent was dispatched to Kansas City in December 1992 to evaluate gaming opportunities and develop a gaming proposal to present to the Port Authority. The proposal was to include, *inter alia*, an outline of "Hilton's commitment to minority participation in the construction and operation of the [proposed] casino, minority ownership in the casino, and the funding of social minority grants in Kansas City to assist problem gamblers, minority busi-

nesses and other organizations actively assisting minorities." With respect to such grants, the respondent met with numerous members of the minority business community, including Elbert Anderson, the president of the Port Authority.

After much research and consideration, Hilton submitted a proposal for site B, but not site A. Both Promus and Boyd proposed building a casino on site A, but not site B. On January 12, 1993, the Port Authority, in a four-to-three decision, voted to accept Hilton's bid. The deciding vote in favor of Hilton was cast by Anderson. Thereafter, the respondent and Hilton's attorneys began negotiating the specific terms of the development agreement with the Port Authority. However, it soon became apparent that site B was unsuitable for construction due to various concerns, such as hazardous wastes, underground electrical conduits, and delicate brick-lined sewers. After Hilton proposed changing their gaming development from site B to site A, Boyd and members of the Kansas City city council became concerned that Hilton had executed a "bait and switch" with respect to its proposal for site B. Consequently, negative publicity and media coverage ensued, and talks between Hilton and the Port Authority began to break down, as Anderson became concerned that Hilton did not have the necessary leadership to continue with the project.

In light of the problems with the project, the respondent met with Bill Black, a prospective minority investor in Hilton's casino project, and Anderson at a restaurant in Kansas City in early February 1993 to discuss their respective concerns. According to the State, at this meeting, the respondent thanked Anderson for helping Hilton acquire the Kansas City bid and asked him what he personally wanted in return for his continuing support. Anderson stated that he wanted Hilton to fund a seminar/fashion tour in the amount of $1,000,000 to be conducted in conjunc-

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

tion with the Black Expo, to which the respondent agreed. As a result of this agreement, Anderson understood that his vote on any future developments as to Hilton's casino, including a change to site A, had been "financially secured."

On February 4, 1993, Black sent a letter to the respondent setting forth a proposal for a seminar/fashion tour called Savoir Faire[2] to be funded by a "corporate sponsorship fee" commitment by Hilton of $250,000 per year for five years. Accordingly, on February 25, 1993, at the direction of the respondent, a provision was placed in the Development Agreement concerning funding of "social/minority grants" in the amount of $250,000 per year for five years, subject to Hilton's being licensed in Missouri and construction of the riverboat casino on site A. Shortly thereafter, before the Development Agreement was finalized,[3] the respondent left his employment with Hilton to accept a position elsewhere.

On March 24, 1993, Hilton received a letter from a company called K.C. Perspectives (KCP) seeking a social/minority grant as provided in the Development Agreement. The owner of KCP was Michelle Lathan, an employee of Anderson's with whom he was having an affair and the former manager of Savoir Faire. Anderson testified that he contacted numerous Hilton officials to pressure them into awarding the grant to KCP. On July 13, 1993, Hilton advised the Port Authority that it had selected KCP to receive the first $250,000 social/minority grant. In August 1993, Hilton awarded the grant to KCP, even though it was not required by its agreement to do so until after receiving its Missouri gaming license in October 1996.

Sometime in 1996, the Commission began investigating suspected improprieties committed by Anderson while he was president of the Port Authority. On October 2, 1996, in connection with this investigation, the Commission held a hearing at which the respondent was called to testify under oath concerning the award of the social/minority grant to Savior Faire and its connection to Anderson, as a result of his relationship with Lathan. Under questioning by the Commission concerning the awarding of a grant to Savoir Faire, the respondent testified under oath that he had no authority to award a grant to any organization, and that at no time had Anderson approached him about Savoir Faire.

In September 1997, Anderson was indicted and convicted in federal court on an unrelated bribery scheme. In order to receive a reduced sentence as to his conviction, he cooperated with FBI agents by providing testimony before a federal grand jury investigating the respondent that the respondent, without asking for anything in return, had offered him a bribe in the form of a commitment to fund a social/minority grant program. After considering all of the evidence, including Anderson's statements and grand jury testimony and the respondent's testimony on October 2, 1996, before the Missouri Gaming Commission, and after conducting interviews of Black and Willone Eubanks, a prominent Kansas City African-American businessman, the federal grand jury declined to indict the respondent. However, on December 21, 1998, as a result of Anderson's cooperation, a Jackson County grand jury indicted the respondent for three counts of making false statements to the Missouri Gaming Commission in violation of § 313.550.3. The indictment alleged that, during the October 2, 1996, hearing conducted in connection with the Commission's investigation of Anderson, the respondent, under

---

2. Savoir Faire was a program run by Michelle Lathan in the late 1980s which held seminars for women of color.

3. The Development Agreement was finalized in April 1993, and was approved by Hilton in July 1993. This agreement included a provision for social/minority grants of $250,000 each for five years, but did not specify any one beneficiary or organization as the recipient.

oath, gave false testimony in three separate instances.

On October 7, 1999, the respondent filed a motion to dismiss the indictment and suggestions in support thereof, alleging, *inter alia*, that the State had failed to allege conduct on his part that constituted an offense under § 313.550.3.[4] On January 10, 2000, the trial court sustained the respondent's motion finding that § 313 .550.3 "applie[d] only to horse racing activities and not to excursion gambling boat activities."

This appeal follows.

## I.

In its sole point on appeal, the State claims that the trial court erred in dismissing the indictment against the respondent as being fatally defective for failing to allege an essential element of the crime of giving false testimony before the Commission in violation of § 313.550.3, because, to establish such a violation, the court erroneously interpreted that section as requiring proof that the respondent gave false testimony before the Commission concerning horse racing, rather than excursion gambling boats. Specifically, the State claims that the acts of the respondent alleged in the indictment did, in fact, constitute violations of § 313.550.3 in that by amending § 313.500(2), RSMo Supp.1995, changing the definition of "commission," for purposes of § 313.550.3, from the "Missouri horse racing commission" to the "Missouri gaming commission," the legislature intended that false testimony before the Missouri Gaming Commission on any matter properly before it, including false testimony concerning excursion gambling boats, would be a violation of the section. The respondent contends that, even assuming without conceding that his testimony before the commission concerning excursion gambling boats was false, it was not a crime under § 313.550.3, because, despite the change in the definition of "commission," the section continued to apply only to false testimony before the Commission concerning horse racing. In this regard, he argues that the amendment to § 313.500(2) defining "commission" only changed the governing body before which it was a crime under § 313.550.3 to give false testimony; and that it did not expand the statute's reach to false testimony concerning matters other than horse racing. Thus, in determining whether to affirm the trial court's dismissal of the indictment against the respondent, we must decide whether the trial court was correct in interpreting § 313.550.3 as requiring the State to plead and prove, as an essential element of a crime charged under that section, that the respondent gave false testimony before the Commission concerning horse racing, rather than excursion gambling boats as alleged.

■ Rule 23.01(b)[5] requires that, to be sufficient, an indictment or information must state: (1) the name of the defendant; (2) the essential facts constituting the offense charged; (3) the time and place of the offense charged; (4) the section of the statutes alleged to have been violated; and (5) the name and degree, if any, of the offense charged. The indictment or information must contain all of the essential elements as set out by the statute creating the offense. *State v. Briscoe*, 847 S.W.2d 792, 794 (Mo. banc 1993); *State v. Haynes*, 17 S.W.3d 617, 619 (Mo.App.2000) (citations omitted). Defenses based on defects in the information or indictment are generally required to be raised by motion before trial, Rule 24.04(b)2, which the respondent

---

**4.** A review of the respondent's motion reflects that he did not expressly allege that the indictment against him was facially defective in that the instances of false testimony before the Commission concerning excursion gambling boats alleged in the indictment did not constitute violations of § 313.550. He did, however, make this argument in his suggestions filed in support of his motion.

**5.** All rule references are to the Missouri Rules of Criminal Procedure (1999), unless otherwise indicated.

did here. The respondent alleged in a motion to dismiss that the indictment was fatally deficient in that it failed to allege an essential element of a crime under § 313.550.3.

Although not conceded by the respondent, for purposes of this appeal, there is no dispute about the acts of the respondent alleged in the indictment as violating § 313.550.3. In that regard, the State alleged that the respondent gave false testimony before the Missouri Gaming Commission concerning the awarding of social/minority grants by Hilton as part of its establishment of a riverboat gambling operation in Kansas City. The dispute is whether or not these acts, if committed, constituted a violation of § 313.550.3 as interpreted by the trial court in dismissing the indictment. Hence, if the State is correct in its claim that the trial court misinterpreted § 313.550.3 such that the respondent's alleged acts of giving false testimony before the Missouri Gaming Commission concerning excursion gambling boats would constitute violations of that section, then we must reverse the ruling of the trial court. However, if we find that the trial court's interpretation of § 313.550.3 is correct, then we must affirm.

■ The State brings this appeal pursuant to § 547.200.2, RSMo Supp.2000. Under this section, appeals can be brought by the State provided that no double jeopardy for the defendant will result. *State v. Casaretto*, 818 S.W.2d 313, 315–16 (Mo. App.1991). Double jeopardy only attaches where the court makes determinations as to the guilt or innocence of a defendant. *Serfass v. United States*, 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265, 276 (1975). Thus, because the pretrial dismissal in this case did not entail a determination of the respondent's guilt or innocence, double jeopardy is not an issue, such that the State's appeal is allowed. *Id.*

■ In appealing the trial court's dismissal of the indictment, the State is asking us to review the sufficiency of the indictment in charging the respondent under § 313.550.3, based on its interpretation of that section. "Our review of this claim is de novo as the dismissal of an indictment or information for failure to state an offense is a question of law." *State v. Boone Ret. Ctr., Inc.*, 26 S.W.3d 265, 270 (Mo.App.2000) (*citing State v. Rousan*, 961 S.W.2d 831, 845 (Mo. *banc* 1998)); *State v. Plastec, Inc.*, 980 S.W.2d 152, 154 (Mo. App.1998). As such, in our review, we are not to pay any deference to the trial court's interpretation of the implicated statute inasmuch as it is a question of law. *Hinton v. Dir. of Revenue*, 21 S.W.3d 109, 112 (Mo.App.2000) (citation omitted).

■ When interpreting statutes, our primary responsibility is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning. *State v. Knapp*, 843 S.W.2d 345, 347 (Mo. *banc* 1992); *State v. Williams*, 24 S.W.3d 101, 115 (Mo.App.2000). The legislature "is presumed to have intended what the statute says; consequently, when the legislative intent is apparent from the words used and no ambiguity exists, there is no room for construction." *State v. Haskins*, 950 S.W.2d 613, 615 (Mo.App.1997).

■ Section 313.550.3 reads:

Any person who testifies falsely under oath in any proceeding before, or any investigation by, the commission, its secretary, or the stewards, upon conviction, shall be guilty of a class D felony.

" 'The legislature's own construction of its language by means of definition of the terms employed should be followed in the interpretation of the statute to which it relates....' " *State v. Hermanns*, 641 S.W.2d 768, 769 (Mo. *banc* 1982) (*quoting Labor's Educ. & Political Club-Indep. v. Danforth*, 561 S.W.2d 339, 346 (Mo. *banc* 1978)). As to a statutory definition, prior

to its 1995 amendment, § 313.500(2), RSMo 1986, defined "commission," as used in § 313.550.3, as the "Missouri horse racing commission or its designate." However, pursuant to a 1995 amendment, it is now defined as "the Missouri gaming commission." § 313.500(2), RSMo Supp.1996. Using the present definition of commission and giving the language of the statute its plain and ordinary meaning, we would agree with the State's contention that the statute, *when read in isolation*, would appear to make it a crime to give false testimony before the Missouri Gaming Commission on any matter, not just matters concerning horse racing. The problem with the State's contention is that it completely ignores the fact that this statute is part of a statutory scheme within Chapter 313 to separately regulate the four gaming activities allowed in Missouri.

■■■ "[I]t is fundamental that a section of a statute should not be read in isolation from the context of the whole act." *Haskins,* 950 S.W.2d at 615 (*citing Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492, 499 (1962)). "In interpreting legislation, 'we must not be guided by a single sentence . . . but [should] look to the provisions of the whole law, and to [*sic* ] its object and policy.'" *Id.* (*quoting Richards,* 369 U.S. at 11, 82 S.Ct. at 592, 7 L.Ed.2d at 499); *see also State v. Withrow,* 8 S.W.3d 75, 80 (Mo. *banc* 1999) (holding that "the court considers the particular statute together with related statutes which shed light on its meaning, [and] that the court must consider the purpose or goal of the statute and any relevant conditions existing at the time it was enacted"); *Knapp,* 843 S.W.2d at 347 (holding that "[i]n determining leg-

islative intent, the reviewing court should take into consideration statutes involving similar or related subject matter when those statutes shed light on the meaning of the statute being construed"). Guided by these principles, we are forced to conclude that the interpretation of § 313.550.3 argued for by the State is incorrect when it is read in context with the other provisions of Chapter 313.

■■■ In Missouri, prior to 1980, "lotteries or gift enterprises" were prohibited by MO. CONST. art. 3, § 39(9) (1978), and gambling was prohibited by Chapter 572, RSMo 1978. On November 4, 1980, bingo was legalized by the adoption of MO. CONST. art. 3, § 39(a). Thereafter, in 1981, the Missouri General Assembly passed House Bill No. 322, entitled "AN ACT relating to the licensing and regulation of the conducting of bingo games, with penalty provisions,"[6] which became effective on September 28, 1981. The Act was codified in §§ 313.005—313.080, RSMo Supp.1982.

On November 6, 1984, the voters adopted two proposed constitutional amendments, one authorizing a state lottery, Constitutional Amendment No. 5, and one authorizing pari-mutuel wagering on horse racing, Constitutional Amendment No. 7, adding § 39(b) and § 39(c) to MO. CONST. art. 3 (1984).[7] *Barnes v. Bailey,* 706 S.W.2d 25, 27 (Mo. *banc* 1986). With respect to the lottery, the legislature in 1985 passed Senate Bill No. 44 entitled "AN ACT relating to a state lottery, with penalty provisions and an emergency clause," which became effective on June 11, 1985. This act was codified in §§ 313.200—313.350, RSMo 1986. As to horse racing, the legislature in 1986 passed

---

6. We refer to and include the titles of the acts because, as an aid to statutory interpretation, we are allowed to consider an act's title when construing the meaning of the provisions therein. *Bullington v. State,* 459 S.W.2d 334, 341 (Mo.1970). We further note that the headings used by the revisers of the statutes correspond with and appear to be derived from the titles of the acts.

7. On the ballot for adoption of the amendments, both provisions were designated as § 39(b). After a constitutional challenge in *Barnes v. Bailey,* 706 S.W.2d 25 (Mo. *banc* 1986), based in part on this dual designation, a special election was held on August 5, 1986, renumbering the horse racing subsection as § 39(c).

Senate Bill No. 572, entitled "AN ACT ... for the purpose of regulating pari-mutuel wagering on horse racing, with penalty provisions and an emergency clause," which became effective May 6, 1986. This act was codified in §§ 313.500—313.710, RSMo 1986.

In 1992, the legislature passed House Bill No. 149, submitting to the voters "Proposition A," to authorize by state statute excursion gambling boats upon the Mississippi and Missouri Rivers, which was adopted by the voters on November 3, 1992. The proposition was entitled "AN ACT to repeal sections 572.010 and 572.100, RSMo 1986, relating to certain gaming activities, and to enact in lieu thereof twenty-three new sections relating to the same subject, with penalty provisions and a referendum clause." This act was codified in §§ 313.800—313.850, RSMo Supp. 1993. A constitutional challenge to the act was made in *Harris v. Mo. Gaming Comm'n*, 869 S.W.2d 58, 60–61 (Mo. *banc* 1994), challenging the legislature's authority to legalize excursion gambling boats without amending the constitution. The Missouri Supreme Court held in *Harris* that statutory authorization of excursion gambling boats was allowed as to "games of skill," but not as to "games of chance." *Id.* at 62. Consequently, in 1994, pursuant to House Joint Resolution 43, a proposed constitutional amendment to MO. CONST. art. 3 was submitted to voters which was adopted and became effective on November 8, 1994, legalizing games of chance on the riverboats. MO. CONST. art 3, § 39(e).

The various statutes comprising Chapter 313 have been amended from time to time since their enactment. However, the legislative scheme of grouping the licensing and regulatory statutes and penalty provisions by the gaming activity involved clearly appears to have remained intact in every instance, unless, of course, we are to agree with the State's argument on appeal. In this regard, the State argues that the legislature, by amending the definition of "commission," as it is used in § 313.550.3, from the "Missouri horse racing commission," § 313.500(2), RSMo 1986, to the "Missouri gaming commission," § 313.500(2), RSMo Supp.1995, intended to create an exception to the scheme such that § 313.550.3 would apply to any false testimony before the Commission regardless of the gaming activity involved.

At the time § 313.550.3 was enacted, there can be no dispute that, given the title of the act of which it was a part, "AN ACT ... for the purpose of regulating pari-mutuel wagering on horse racing, with penalty provisions and an emergency clause," Senate Bill No. 572, 1986, and the then definition of "commission" as found in § 313.500(2), RSMo 1986, it applied only to false testimony before the Missouri Horse Racing Commission concerning matters of horse racing. Section 313.550.3 has not been amended since its enactment. The only amendment to the sections of the original act affecting the application of § 313.550.3 was the 1995 amendment to the definitional section, § 313.500(2), RSMo Supp.1995, amending the definition of "commission" to the "Missouri gaming commission."

█ The Missouri Gaming Commission was created· in 1993 by the enactment of § 313.004, RSMo Supp.1993. The amendment to § 313.500(2) changing the definition of "commission" was enacted as part of the same legislation which reassigned the Missouri Horse Racing Commission from the Department of Revenue, § 313.510, RSMo 1986, to the Missouri Gaming Commission, § 313.510, RSMo Supp.1995. The same definition of "commission" as found in the present version of § 313.500(2) was previously enacted in 1993 for bingo, § 313.005(3), and excursion gambling boats, § 313.800(4), as part of legislation creating the Commission, § 313.004, RSMo Supp.1993. The "legislature is presumed not to enact meaningless provisions, and when it amends a statute, it is also presumed to have intended the amendment to have some effect or to accomplish some legislative purpose." *Ben-*

*nett v. Dir. of Revenue,* 889 S.W.2d 166, 169 (Mo.App.1994); *see Wollard v. City of Kansas City,* 831 S.W.2d 200, 203 (Mo. banc 1992). As such, it would appear that these definitional enactments or amendments were intended by the legislature to simply reflect the creation of the Missouri Gaming Commission and the extent of its powers, including its powers as to horse racing, and were not done to extend the application of § 313.550.3 to matters other than horse racing, as the State contends.

■ As further support for holding that § 313.550.3 does not apply to gaming activities other than horse racing, we note that § 313.802 provides: "Sections 313.800 to 313.840 do not apply to the state lottery, bingo, or to the pari-mutuel system of wagering used or intended to be used pursuant to this chapter." This section reflects a clear intent by the legislature that the provisions regulating and licensing excursion gambling boats and the penalty provisions for the same were to be separate and distinct from similar provisions affecting the other gaming activities. On this issue, we would further note that § 313.550.1 authorizes the Commission to issue subpoenas, as do §§ 313.325 and 313.805(10). From this it is obvious to us that the legislature did not· intend any overlap with respect to the various statutory provisions regarding witnesses appearing before the Commission concerning horse racing, the state lottery, and excursion gambling boats. Otherwise, there would have been no need for three separate statutes essentially governing the same power of the Commission to subpoena witnesses. As stated, *supra,* the legislature is presumed to know the state of the law and to pass only those statutes which have some effect or purpose. *Bennett,* 889 S.W.2d at 169.

■ Even if we were not otherwise convinced that the legislature never intended for the amendment of § 313.500(2), RSMo Supp.1995, defining "commission" to extend the application of § 313.550.3 to matters other than horse racing, there can be no doubt of that proposition after the legislature's passage of Senate Bill 902 this past legislative session, wherein it amended § 313.830 to provide that: "A person commits a class D felony, and in addition, shall be barred for life from excursion gambling boats under the jurisdiction of the commission, if the person ... [k]nowingly makes a false statement of any material fact to the commission, its agents, or employees." § 313.830.4(15). This would, of course, cover the alleged criminal acts with which the State charged the respondent under § 313.550.3. Thus, if, as the State contends, § 313.550.3 already covered the respondent's alleged criminal acts, there would have been no reason for the legislature to have enacted § 313.830.4(15). Again, the legislature is presumed to know the state of the law and to enact only those statutes which have meaning and purpose. *Bennett,* 889 S.W.2d at 169. In other words, we presume that the legislature will not enact unnecessary laws. *State v. Moriarty,* 914 S.W.2d 416, 423 (Mo.App.1996) (*citing Wollard,* 831 S.W.2d at 203). Thus, we infer from the enactment of § 313.830.4(15) that the legislature never intended for § 313.550.3 to apply to false testimony before the Commission concerning excursion gambling boats, as the State contends.

Because we interpret § 313.550.3 as only applying to false testimony before the Missouri Gaming Commission concerning matters of horse racing, we find that the trial court was correct in dismissing the indictment against the respondent as failing to allege facts essential to establishing a violation of § 313.550.3 as charged.

### Conclusion

The judgment of the circuit court dismissing the indictment against the respondent is affirmed.

SPINDEN, C.J., and ULRICH, J., concurs.