

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| MARY FOX, et al., | ) | *Opinion issued March 15, 2022* |
| | ) | |
| Respondents/Cross-Appellants, | ) | |
| | ) | |
| v. | ) | No. SC98909 |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Appellants/Cross-Respondents. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
### The Honorable Patricia S. Joyce, Judge

Five public defenders and three criminal defendants filed an action for declaratory and injunctive relief, challenging the constitutional validity of certain statutes that relate to victims of sexual offenses. The provisions were enacted by Senate Bill No. 569 ("SB 569") in 2020. Most importantly, the action attacked section 595.201,[1] which requires criminal defense attorneys to provide information to victims of sexual assault offenses. The circuit court 1) determined section 595.201 violated defense attorneys' rights to freedom of speech, 2) declared it constitutionally invalid as applied to defense counsel, and 3) enjoined its enforcement. The circuit court, however, rejected various challenges

---

[1] All statutory references are to RSMo Supp. 2020, unless otherwise specified.

to SB 569 as a whole by holding passage of the law did not violate procedural limitations—namely, the original purpose, clear title, and single subject requirements—imposed by the Missouri Constitution. The judgment is affirmed.

## Background

In 2020, the General Assembly passed legislation addressing issues relating to victims of sexual assault offenses.  SB 569, upon introduction, concerned evidentiary collection kits in sexual assault cases.[2]  Before final approval, four provisions—including section 595.201.2(4), which is of particular importance in this case—were added.[3]  That provision states:

> Before commencing an interview of a survivor, a law enforcement officer, prosecuting attorney, or defense attorney shall inform the survivor of the following:
>
> (a) The survivor's rights pursuant to this section and other rules and regulations by the department of public safety and the department of health and senior services, which shall be signed by the survivor of sexual assault to confirm receipt;
>
> (b) The survivor's right to consult with an employee or volunteer of a rape crisis center during any interview by a law enforcement official, prosecuting attorney, or defense attorney, to be summoned by the interviewer before the commencement of the interview, unless no employee or volunteer of a rape crisis center can be summoned in a reasonably timely manner;

---

[2] Initially, the legislation modified section 595.220 by creating an electronic system that allowed sexual assault victims to track and obtain information regarding the status of their evidentiary collection kits.  It also established other rules and guidelines relevant to the system.

[3] The other amendments established sections 195.2520, 197.135, and 595.202.  Respectively, those statutes 1) created a telehealth network for conducting forensic examinations in sexual offense cases; 2) established requirements for certain hospitals regarding forensic examinations in sexual offense cases and allowed patients to waive the requirements; and 3) created a task force to study and recommend best practices regarding various aspects of addressing sexual offenses cases.

2

(c) The survivor's right to have a support person of the survivor's choosing present during any interview by a law enforcement officer, prosecuting attorney, or defense attorney, unless the law enforcement officer, prosecuting attorney, or defense attorney determines in his or her good faith professional judgment that the presence of that individual would be detrimental to the purpose of the interview; and

(d) For interviews by a law enforcement officer, the survivor's right to be interviewed by a law enforcement official of the gender of the survivor's choosing. If no law enforcement official of that gender is reasonably available, the survivor shall be interviewed by an available law enforcement official only upon the survivor's consent[.]

In August 2020, one day before the effective date of the legislation, individuals associated with the Missouri State Public Defender—Mary Fox, Megan Beesley, Paige Bremner, Erich Fonke, and Brian Horneyer—and criminal defendants—Dawan Ferguson, Sean Williams, and Donnell Jackson—(collectively, "Challengers") filed an action for declaratory and injunctive relief against the State of Missouri and Attorney General Eric Schmitt (collectively, the "State"). They alleged section 595.201 violated 1) defense attorneys' right to freedom of speech under the federal and state constitutions; 2) separation of powers principles under the Missouri Constitution; 3) this Court's ability to regulate the legal profession under the Missouri Constitution; 4) criminal defendants' rights to counsel and confrontation under the federal constitution; and 5) criminal defendants' rights to due process and counsel under the Missouri Constitution. Challengers further contended SB 569 violated the original purpose, reading, clear title, and single subject requirements of the Missouri Constitution. The circuit court issued a temporary restraining order prohibiting enforcement of section 595.201 against defense attorneys.

Challengers moved for a preliminary injunction. At a hearing, three individuals—Mary Fox, Megan Beesley, and Erich Fonke—testified for Challengers. They explained that informing victims about the rights contained in section 595.201.2(4) would adversely affect representation of their clients. Fox indicated complying with the provision would create an impression that defense attorneys were working for the prosecution, create conflicts of interest, and violate other duties to clients. She testified attorney-client relationships would likely be harmed. Beesley also indicated complying with the statutory requirements would be adverse to client interests. Fox also expressed concern regarding section 595.201.3(11)'s definition of "survivor," indicating she may need to provide the required information to many individuals in various contexts.

Laura Dunn, an expert regarding sexual assault victims' rights, testified for the State. She explained sexual assault victims often report having negative interactions with aspects of the criminal justice system, including dealings with prosecutors and defense attorneys, which can create secondary trauma and reduce cooperation. Dunn stated survivors are more willing to engage in the process when support advocates are present. She testified that, for survivors to make use of the rights listed in section 595.201.2(4), they must receive information prior to the interview. Dunn opined measures other than providing the rights directly before the beginning of an interview would be ineffective. She said survivors are often confused and traumatized, which may hinder their ability to retain information over time. Dunn did not provide specific evidence of interactions with defense attorneys creating secondary trauma and was unaware of other victims' rights bills that required defense attorneys to provide information.

4

The circuit court sustained Challengers' motion for a preliminary injunction. Challengers and the State later agreed to an amended temporary restraining order, which was extended until the entry of a final judgment. Subsequently, the circuit court issued a judgment and memorandum opinion, which found for Challengers on all substantive constitutional claims[4] and declared section 595.201 constitutionally invalid as applied to defense attorneys. Regarding the free speech claims, it determined 1) no evidence established defense attorneys caused the harms SB 569 was intended to address; 2) no credible evidence showed the State had an interest in requiring defense attorneys to make the disclosures required by section 595.201.2(4); and 3) no evidence demonstrated an absence of less restrictive alternatives to having defense attorneys provide the disclosures. The circuit court further held that, while procedural aspects of the passage of SB 569 created close questions, the presumption of constitutional validity controlled. It declined, therefore, to invalidate the entire statutory scheme. The State appeals, and Challengers cross-appeal.[5]

### Standard of Review

In a court-tried case, the circuit court's judgment will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, erroneously declares the law, or erroneously applies the law. *Mo. State Conf. of NAACP v. State*, 607

---

[4] The circuit court held section 595.201 violated separation of powers principles, this Court's authority to regulate the legal profession, and criminal defendants' rights. While the State appealed these rulings, this Court need not address those contentions because of the opinion's resolution of other issues.

[5] This Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution.

S.W.3d 728, 731 (Mo. banc 2020). Decisions regarding the constitutional validity of a statute are subject to *de novo* review. *Priorities USA v. State*, 591 S.W.3d 448, 452 (Mo. banc 2020). A statute is presumptively valid and will be upheld unless it clearly and undoubtedly violates a constitutional provision. *Id.* Nevertheless, this Court must declare a statute invalid if it conflicts with the constitution. *Id.* And, although "[c]onstitutional attacks based upon the procedural limitations contained in article III, sections 21 and 23 [of the Missouri Constitution] are not favored[,]" the same standard applies. *Calzone v. Interim Comm'r of Dep't of Elementary & Secondary Educ.*, 584 S.W.3d 310, 315 (Mo. banc 2019).

## Analysis

The State alleges the circuit court erroneously determined section 595.201.2(4) was constitutionally invalid as applied to defense attorneys. It argues that provision did not violate defense attorneys' right to freedom of speech; separation of powers principles; this Court's ability to regulate the legal profession; or criminal defendants' constitutional rights.[6] On cross-appeal, Challengers contend the circuit court improperly determined the General Assembly did not violate the original purpose, clear title, and single subject requirements imposed by the Missouri Constitution when passing SB 569.[7]

---

[6] Challengers posit the State's briefing failed to follow procedural rules by including insufficient points relied on; failing, for various reasons, to properly attack aspects of the circuit court's judgment; and providing incomplete standards of review. They contend these issues are fatal to the State's appeal, require certain parts of the judgment to be affirmed, and support dismissal. Because Challengers' arguments are unpersuasive, the requested relief is not warranted.

[7] Before the circuit court, Challengers argued the General Assembly violated the Missouri Constitution because the senate failed to read SB 569 three times before the legislation was passed. The circuit court rejected the claim, and Challengers do not dispute that ruling on appeal.

## I.      Free Speech Claims

The State challenges the circuit court's judgment that section 595.201.2(4)'s requirements violate defense attorneys' free speech rights.  State laws that restrict freedom of speech are prohibited by the First and Fourteenth Amendments.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("NIFLA").  Laws that regulate speech based on its communicative content "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Id.*  Notices requiring individuals to speak a specific message constitute content-based regulations.  *Id.*  Importantly, speech uttered by "professionals" receives constitutional protection.  *Id.* at 2371-72.  Yet less protection is provided when laws require "professionals to disclose factual, noncontroversial information in their 'commercial speech'"[8] or regulate professional conduct and only incidentally burden speech.  *Id.* at 2372.  Aside from these categories, professionals are entitled to the protections of the First Amendment, and strict scrutiny applies when content-based regulations restrict an attorney's noncommercial speech.  *Id.* at 2374.

The State admits section 595.201.2(4) requires defense attorneys to provide certain information before beginning an interview with a sexual assault victim.  But it argues the

---

[8] Commercial speech is "usually defined as speech that does no more than propose a commercial transaction[.]"  *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *see also Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983) (noting the pamphlets at issue were advertisements, referenced a specific product, and were mailed because of an economic motivation).  To the extent the State alleges section 595.201 requires professionals to provide factual, noncontroversial disclosures during commercial speech, the contention is unpersuasive.  When section 595.201.2(4) applies, defense attorneys are not proposing a commercial transaction, advertising a service, or acting purely on economic motivation and, therefore, are not engaging in commercial speech.

provision addresses the criminal justice system's interactions with such victims because any burdens on speech are incidental to the regulation of professional conduct. Specifically, the State posits section 595.201.2(4) regulates attorney conduct, noting Challengers alleged the General Assembly impermissibly regulated attorneys' professional conduct and defense attorneys may be required to engage in conduct, such as summoning certain individuals to an interview. It then alleges any regulation of speech is incidental because the information is factual, multiple non-judicial actors are also required to make these disclosures, and attorneys need not agree with the required statements or answer questions.

"While drawing the line between speech and conduct can be difficult, [the Supreme] Court's precedents have long drawn it[.]" *NIFLA*, 138 S. Ct. at 2373. When analyzing whether a law regulates professional conduct or speech, the following considerations are helpful:

> Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's [limitations].

*Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring). Section 595.201.2(4) is not closely related to professional conduct. Initially, the personal nexus between professional and client is attenuated. While the interviews take place in the context of a profession, the individual being interviewed is not a client of the defense attorney, and section 595.201.2(c)(4) imposes new obligations. Attorneys owe duties to third parties,

8

*see*, *e.g.,* Rules 4-4.1, 4-4.3, but no similar requirement—providing extensive information to the individual being interviewed regarding rights unrelated to whether one should seek counsel—previously existed in this context. In conjunction with these issues, the application of section 595.201.2(4)(c) may create further concerns regarding professional obligations, as Challengers assert complying with the statute will hinder their relationship with their actual clients.

Additionally, the exercise of professional judgment is not required. While a defense attorney exercises his or her judgment when deciding who to interview and how to conduct an interview, the required disclosures are unrelated to those aspects of the profession. Instead, specific information must be provided to the individual being interviewed, regardless of one's professional judgment. Although section 595.201.2(4)(c) may require defense attorneys, as interviewers, to determine whether the presence of another would be detrimental, that requirement is closely connected to the disclosure of rights. And, while some conduct, such as obtaining a signed receipt, is mandated, providing certain information to a survivor is an important aspect of the provision's requirements. Section 595.201.2(4) is not a regulation of professional conduct that incidentally burdens speech. It is primarily a burden on speech that tangentially relates to professional conduct.

The State analogizes this case to *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (plurality opinion). There, a law "require[d] that a woman seeking an abortion give her informed consent prior to the abortion procedure[] and specifie[d] that she be provided with certain information at least 24 hours

before the abortion [was] performed." *Id.* at 844. Physicians contended the compelled disclosures violated their First Amendment rights. *Id.* at 884. The Supreme Court held the right not to speak was implicated "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State[,]" and found the requirement was not constitutionally infirm. *Id.*

The State also relies on *NIFLA*. In that case, a law required licensed and unlicensed facilities to provide notices regarding abortion. *NIFLA*, 138 S. Ct. at 2369-70. The Supreme Court analyzed whether the notice licensed facilities were required to give was a regulation of conduct that only incidentally burdened speech. *Id.* at 2373. It referenced *Casey*, noting the law in that case required doctors to provide information and tort law has long required doctors to obtain informed consent before a procedure. *Id.* *NIFLA*, however, held the notice was not related to informed consent, as it applied to all interactions with clients, regardless of what procedure was sought, and did not provide information about the risks or benefits of a procedure. *Id.*

Relying on *State v. S.F.*, 483 S.W.3d 385 (Mo. banc 2016), the State argues this Court has recognized regulations of conduct that incidentally impact speech are permissible. There, this Court analyzed a statute making it unlawful for an individual with HIV to engage in sexual relations with another without that person's knowledge of and consent to the exposure to HIV. *Id.* at 387. The defendant argued her free speech rights were violated because she was required "to speak that which she would prefer not to say, i.e., that she is HIV positive." *Id.* This Court disagreed, finding the statute regulated conduct, rather than speech. *Id.* at 387-88. It stated the statute's purpose was

10

"to prevent certain conduct that could spread HIV to unknowing or nonconsenting individuals[,]" not compel disclosure. *Id.* at 388. Because any required disclosure imposed only an incidental burden on speech, the statute did not violate freedom of speech protections. *Id.*

Unlike the above cases, the regulation of speech, compared with the regulation of conduct, is much more significant. The regulations in *Casey* and *NIFLA* were tied to a preexisting professional requirement—obtaining informed consent before performing a procedure. While *Casey* did not mention informed consent, *NIFLA* recognizes that principle was an important aspect of the decision. *See NIFLA*, 138 S. Ct. at 2373-74. As a result, the required speech—providing certain disclosures—was incidental to professional conduct—obtaining informed consent. The regulation here, though, does not closely correspond to a preexisting professional requirement, and the compelled speech is more significant than the regulation of professional conduct.

*S.F.* also supports this distinction. There, the statute solely prohibited conduct and did not directly compel a disclosure. *S.F.*, 483 S.W.3d at 387-88. While a disclosure may have been required, the statute's purpose was to regulate conduct. *Id.* Dissimilarly, section 595.201.2(4) specifically compels speech in certain circumstances. Conduct—engaging in an interview—may trigger the speech requirement, but the disclosures are the true focus of the statute. Some conduct, like obtaining a signature from the individual being interviewed or summoning another, may also be required. *See* section 595.201.2(4)(a)-(b). But these actions are secondary to informing survivors of their rights.

11

Because section 595.201.2(4) is not a regulation of conduct that incidentally burdens speech, strict scrutiny applies. To meet its burden, the State must prove the provision serves a compelling state interest and is narrowly tailored. *NIFLA*, 138 S. Ct. at 2371. According to the State, section 595.201.2(4) withstands strict scrutiny. It argues the provision advances the interests of prosecuting and punishing those who violate the law. *See Maryland v. Shatzer*, 559 U.S. 98, 108 (2010). The State notes victims of sexual assault may be reluctant to engage with the criminal justice system and alleges the mandated disclosures are intended to increase cooperation. It also contends section 595.201.2(4) serves the interest of elucidating victims' rights. *See* Mo. Const. art. I, sec. 32; section 595.209.5 (noting "the rights of victims of crime shall be granted and enforced regardless of the desires of a defendant" and "the policy of this state is that the victim's rights are paramount to the defendant's rights"). The State posits these interests are compelling. It also alleges preventing sexual assault survivors from incurring secondary trauma due to interactions with the criminal justice system is another compelling interest.

The State notes Dunn testified sexual assault survivors often feel abused while working through the criminal justice system and have negative interactions with defense counsel, which may create secondary trauma and discourage participation. Dunn stated that, despite these issues, sexual assault victims are more willing to engage in the process if support advocates are available. According to the State, the required disclosures will prevent additional trauma and garner more cooperation from survivors.

12

Even assuming section 595.201.2(4) serves these interests and such interests are compelling, the provision violates the First Amendment because the State has failed to meet the second requirement of strict scrutiny—narrow tailoring. In this context, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). The State has not shown requiring defense attorneys to provide disclosures is narrowly tailored.

The State contends the provision is narrowly tailored because timing of the disclosures is important. It alleges section 595.201.2(4) will be less beneficial if the information is not provided directly before the interview, suggesting other methods may undermine effectiveness. The State argues a survivor's first interaction with the criminal justice system may occur through an interview with a defense attorney. It posits a defense attorney may interview survivors other than the victim of the relevant criminal case, such as the prior victims of an accomplice. It further states these rights are relatively novel, which demonstrates providing the information directly before the interview is appropriate. It relies on Dunn's testimony, which indicated: survivors need to know about these rights to utilize them; a public information campaign would be ineffective because most people believe they will not become a victim or need to engage in the process; and victims may be traumatized and confused, which may hinder the ability to retain information. Because of all this, having the interviewer provide section 595.201.2(4)'s disclosures directly before the interview is purportedly appropriate.

13

Even assuming timing is important, the State has failed to establish the mandate that defense attorneys inform survivors of the above rights is narrowly tailored. Both Challengers and the State, at oral argument, acknowledged victim interviews are usually conducted jointly. Yet, in these circumstances, defense attorneys may be required to provide the information. *See* section 595.201.2(4) (stating that, "[b]efore commencing an interview of a survivor, a law enforcement officer, prosecuting attorney, or defense attorney shall inform the survivor of the following" without describing an order of priority regarding who must provide the disclosure). As a less restrictive alternative, a prosecutor or law enforcement officer could provide the required information during joint interviews.

The State also contends section 595.201.2(4) properly places requirements on defense attorneys because they might be the first members of the criminal justice system to interact with survivors. It references defense attorneys interviewing survivors of an accomplice or another potential perpetrator. This contention is unconvincing. First, section 595.201.2(4)'s requirements are not limited to these circumstances, which suggests the statute is broader than necessary. Second, the State does not indicate how often such interviews take place or allege if they are common. Third, it fails to establish section 595.201.2(4)'s objectives can be achieved only if defense attorneys inform survivors of their rights in these scenarios. While it generally suggests relying on others is insufficient, it does not state that defense attorneys conduct these interviews alone or indicate exactly why prosecutors or law enforcement officers could not inform survivors of their rights shortly before or at the beginning of the interview. Absent more specific

14

allegations, the State has failed to establish that the requirements placed on defense attorneys by section 595.201.2(4) are necessary to achieve the provision's objectives, that the mandate is narrowly tailored, or that no less restrictive alternatives exist. As such, the circuit court properly determined section 595.201 is constitutionally invalid as applied to defense attorneys. The circuit court's judgment that section 595.201.2(4)'s requirements violate defense attorneys' free speech rights is affirmed.[9]

## II.    *Procedural Claims*

Challengers assert the circuit court improperly determined the General Assembly, in passing SB 569, failed to comply with procedural limitations imposed by the Missouri Constitution. They allege the legislation is constitutionally invalid because 1) amendments changed its original purpose, 2) its subject was not clearly expressed in its title, and 3) it was not limited to a single subject.

### A.  Original Purpose Challenge

"[N]o bill shall be so amended in its passage through either house as to change its original purpose." Mo. Const. art. III, sec. 21. The original purpose requirement seeks to protect against hasty litigation, ensure bills are fairly considered, require greater particularity in passed bills, prevent the passage of amended statutes that deceive legislators as to their effects, and allow the public to become informed regarding changes in the law. *Calzone*, 584 S.W.3d at 316-17. Original purpose claims have been consistently rejected when "the content of the introduced bill remained substantially

---

[9] Because the circuit court properly ruled on the free speech basis, this Court need not address the State's other arguments attacking the judgment.

intact throughout the legislative process as germane amendments were added[;]" as a result, legislation is rarely invalidated based on such challenges. *Id.* at 317. In analyzing such challenges, this Court focuses on the bill's general, or overarching, purpose, not details that simply manifest and effectuate the purpose. *Id.* The introduction of amendments germane to the original purpose are permissible. *Id.* Material is germane when it is closely related or pertinent to the initial legislation. *Id.* If these standards are met, changes extending or limiting the scope of the bill are appropriate. *Id.*

Upon introduction, SB 569 was titled "AN ACT To repeal section 595.220, RSMo, and to enact in lieu thereof one new section relating to evidentiary collection kits." It initially created an electronic system, which allowed sexual assault victims to track and obtain information regarding the status of their evidentiary collection kits; required certain persons and entities to participate in the electronic evidence tracking system; and established a repository for unreported kits. All records in the electronic system were also deemed confidential.

Challengers allege that, originally, SB 569 was meant to increase transparency and accountability in processing evidentiary collection kits in sexual assault cases. They contend amendments (i.e., provisions that created a telehealth network for conducting forensic examinations in sexual offense cases; required defense attorneys to inform survivors—which they alleged applies to victims of almost any crime—of various rights; and established a task force regarding best practices and procedures for interactions between various personnel and survivors) are unrelated to that purpose because they have a limited relation to evidentiary collection kits.

Challengers' statement of SB 569's original purpose is too narrow. This Court's precedent is to "broadly and liberally interpret[] a bill's original purpose so as to uphold the bill's constitutional validity." *Id.* at 319. "[E]xpanding the title of a bill to reflect the commonality of all of the subjects contained in the bill is not a novel proposition. It is the process the legislature has routinely used to accommodate amendments to a bill and a process this Court has consistently approved." *Id.* at 318 (alteration in original).

Upon introduction, SB 569 addressed various aspects of an electronic evidence tracking system for evidentiary collection kits and gave sexual assault victims corresponding rights. Taken broadly, SB 569 originally addressed issues relevant to victims of sexual assault offenses. Subsequent amendments established a telehealth network for conducting forensic examinations in sexual offense cases; required individuals to inform survivors—which, as explained below, is properly limited to victims of sexual assault offenses—of various rights; and created a task force to study and recommend best practices regarding various aspects of addressing sexual assault claims. These amendments were germane to that purpose.

Challengers cite two cases for support. *See Legends Bank v. State*, 361 S.W.3d 383 (Mo. banc 2012); *Mo. Ass'n of Club Execs. v. State*, 208 S.W.3d 885 (Mo. banc 2006). In *Legends Bank*, this Court determined a bill's original purpose "pertained to procurement of necessary goods and services for elected officials" and held "[e]thics, campaign finance restrictions[,] and keys to the capitol dome are not germane to" that purpose. 361 S.W.3d at 386. In *Club Executives*, the bill's original purpose involved alcohol-related traffic offenses. 208 S.W.3d at 888. This Court determined subsequent

17

revisions—which addressed non-traffic related alcohol offenses, like the sale of alcohol to minors—were permissible but found three provisions regulating adult entertainment did not fall under the original purpose of the bill. *Id.* Challengers argue that, similar to the amendments discussed in *Legends Bank* and *Club Executives*, the additions to SB 569 were too remote, resulting in a constitutional violation.

Challengers' contentions are misplaced. In the above cases, this Court declared invalid amendments that were completely unrelated to the original purpose of the bill. *See Legends Bank*, 361 S.W.3d at 386; *Club Executives*, 208 S.W.3d at 888. By contrast, the amendments at issue here are related to and connected with the original purpose of SB 569. In fact, the alterations are more similar to those upheld in *Club Executives*, 208 S.W.3d at 888 (finding amendments relating to "certain non-traffic related alcohol offenses, such as the sale of alcohol to minors," were germane to an original purpose relating to alcohol-related traffic offenses).

This Court's holding is further supported by *Stroh Brewery Co. v. State*, 954 S.W.2d 323 (Mo. banc 1997). There, a bill was originally titled "an act to amend chapter 311, RSMo, by adding one new section relating to the auction of vintage wine, with penalty provisions." *Id.* at 325. Subsequent amendments altered various provisions of chapter 311, and one alteration regulated the required label for the sale of malt liquor. *Id.* The final bill was titled "an act to repeal sections 311.102, 311.176, 311.300, 311.330, 311.360, 311.680 and 311.691, RSMo 1994, and section 311.070, RSMo Supp.1995, relating to intoxicating beverages, and to enact in lieu thereof nine new sections relating to the same subject, with penalty provisions." *Id.* This Court rejected an original purpose

18

challenge, holding that, because all subsequent amendments altered Missouri's liquor control law, they were germane to "an act to amend chapter 311." *Id.* at 326. Much like *Club Executives* and *Stroh*, SB 569's original purpose was more specific than the later-adopted amendments, but the changes expanding the bill encompassed logically connected and related material. SB 569 was not amended as to change its original purpose.

### B. Clear Title and Single Subject Challenges

Challengers assert SB 569 did not have a clear title and was not limited to a single subject. Their contentions rely on the premise that section 595.201.3(11)'s definition of "survivor" is not limited to sexual assault offenses. "No bill shall contain more than one subject which shall be clearly expressed in its title[.]" Mo. Const. art. III, sec. 23. A bill's title must clearly express its subject so members of the legislature and the public are fairly informed of the matters addressed by pending laws. *St. Louis Health Care Network v. State*, 968 S.W.2d 145, 147 (Mo. banc 1998). The single subject requirement improves discussion by ensuring the matters covered by bills are more clearly defined, prevents logrolling as well as surprise in the legislative process, and ensures the public is fairly apprised of a bill's contents. *Hammerschmidt v. Boone Cnty.*, 877 S.W.2d 98, 101-02 (Mo. banc 1994).

"[T]o survive a clear title challenge, a bill's title need not give specific details of a bill, but need indicate only generally what the act contains." *St. Louis Health Care Network*, 968 S.W.2d at 147. Typically, challenges assert the title fails to encompass all provisions and, thus, is underinclusive. *Home Builders Ass'n of Greater St. Louis v.*

19

*State*, 75 S.W.3d 267, 270 (Mo. banc 2002).  In this analysis, words are accorded their common and ordinary meaning.  *Id.* at 271.  "The test for whether a bill violates the single subject rule is 'whether the bill's provisions fairly relate to, have a natural connection with, or are a means to accomplish the subject of the bill as expressed in the title.'"  *Mo. Roundtable for Life, Inc. v. State*, 396 S.W.3d 348, 351 (Mo. banc 2013).  "'Subject' . . . includes 'all matters that fall within or reasonably relate to the general core purpose of the proposed legislation.'"  *Id.*

As enacted, SB 569 was titled "AN ACT to repeal section 595.220, RSMo, and to enact in lieu thereof five new sections relating to victims of sexual offenses."  Challengers allege the title was underinclusive because many provisions in section 595.201 mention "survivor," and that term is not limited to sexual assault offenses.  *See* section 595.201.3(11) (defining "survivor" as "a natural person who suffers direct or threatened physical, emotional, or financial harm as the result of the commission or attempted commission of a crime").  Challengers assert this definition applies to any person suffering any harm from any crime or attempted crime, such as theft, gun violence, robberies, and bear wrestling.  They allege that, because this provision is not limited to victims of sexual assault offenses, SB 569 had an underinclusive title and contained more than one subject.  Challengers analogize this case to *Missouri Roundtable for Life*.  There, a bill's title indicated it was related to science and innovation.  *Mo. Roundtable for Life*, 396 S.W.3d at 352.  One provision, though, provided a tax credit for the adoption of special needs children.  *Id.*  Accordingly, this Court determined the bill contained at least two subjects and was constitutionally invalid.  *Id.* at 352-53.

20

Determinations regarding issues of statutory interpretation are questions of law subject to *de novo* review. *Holmes v. Steelman*, 624 S.W.3d 144, 149 (Mo. banc 2021). In analyzing Challengers' arguments, this Court seeks to identify the intent of the legislature by considering the plain meaning of the statutory text. *Id.*

> In determining the meaning of words in a statute, the words should not be read in isolation but rather "must be considered in context and sections of the statutes in *pari materia*, as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words."

*Id.* Additionally, "[s]tatutes are interpreted to avoid unreasonable or absurd results." *St. Louis Police Officers' Ass'n v. Bd. of Police Comm'rs of City of St. Louis*, 259 S.W.3d 526, 528 (Mo. banc 2008); *see also Johnson v. United States*, 559 U.S. 133, 145 (2010) (declining "to import a term of art that is a comical misfit" into a statute).

Challengers' argument fails to consider other provisions in section 595.201. While the definition of "survivor" is broad, its context properly limits the scope of the term. Section 595.201.1 provides "[t]his section shall be known and may be cited as the 'Sexual Assault Survivors' Bill of Rights[.]'" Many provisions also indicate survivors are limited to victims of sexual assault offenses. *See*, *e.g.,* section 595.201.2(1) ("A survivor has the right to consult with an employee or volunteer of a rape crisis center during any forensic examination . . . ."); section 595.201.2(7) ("A survivor has the right to prompt analysis of sexual assault forensic evidence[.]"); section 595.201.2(15) ("In either a civil or criminal case relating to the sexual assault, a survivor has the right to be reasonably protected from the defendant and persons acting on behalf of the

21

defendant[.]"). The context of "survivor" clearly indicates it was not intended to mean anyone suffering any harm from any crime or attempted crime.[10]

Challengers' broad interpretation of the definition of "survivor" also leads to absurd and unreasonable results. Application of the above provisions to someone other than a victim of a sexual assault offense would be nonsensical. Before an interview commences, the subject must be informed of the rights encompassed in section 595.201; the right to consult with an employee or volunteer of a rape crisis center during the interview; the right to have a support person present; and the right to be interviewed by a law enforcement official of the gender of the survivor's choosing. Section 595.201.2(4). Challengers' suggestion that victims of theft, gun violence, robbery, and bear wrestling must be provided this information is unreasonable. Many of the rights in section 595.201 are not relevant to victims of crimes other than sexual assault offenses, and informing such individuals of their right to consult with someone from a rape crisis center is illogical. The statutory definition of "survivor" is limited to victims of sexual assault offenses.

Section 595.201.3(9) defines "sexual assault survivor" as "any person who is a victim of an alleged sexual offense under sections 566.010 to 566.223 . . . ." Notably,

---

[10] Challengers state the judiciary should not correct a mistake by the General Assembly. They argue only section 595.201's text as written should be analyzed, *see State v. Bazell*, 497 S.W.3d 263, 266 (Mo. banc 2016), *superseded by statute on other grounds as stated in Hamilton v. State*, 598 S.W.3d 607, 608 (Mo. banc 2020), and note a statute's definition of a term should be followed for purposes of interpretation. *See State v. Rousseau*, 34 S.W.3d 254, 259 (Mo. App. 2000). This Court has not attempted to correct a mistake, moved beyond the text of the statute, or ignored statutory definitions. Instead, it is considering the definition of "survivor" in the context of section 595.201's other provisions, which is proper.

22

"[t]he legislature will not be presumed to have 'inserted idle verbiage or superfluous language in a statute.'" *State ex rel. Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 586 (Mo. banc 2018). While limiting the definition of "survivor" to sexual assault offenses creates some overlap with the definition of "sexual assault survivor," the latter has not been rendered meaningless or superfluous because "survivor" encompasses additional crimes.

The provisions listed in the definition of "sexual assault survivor" cover various attempted crimes. *See*, *e.g.,* section 566.030.2 (recognizing attempted first-degree rape); section 566.062.2 (recognizing attempted first-degree statutory sodomy). Other statutes in sections 566.010 to 566.223, however, do not mention attempt. *See*, *e.g.,* section 566.031.1 (discussing second-degree rape); section 566.064 (discussing second-degree statutory sodomy). Regardless, the State can utilize section 562.012, the general attempt statute, to prosecute these offenses. *State v. Schallon*, 341 S.W.3d 795, 797 (Mo. App. 2011) (noting the defendant was charged with attempted second-degree statutory sodomy in violation of a prior version of the attempt statute and section 566.064); *see also State v. Young*, 139 S.W.3d 194, 195-98 (Mo. App. 2004) (affirming a conviction for attempted second-degree statutory rape in violation of section 566.034 and a prior version of the attempt statute). These attempted offenses do not fall solely within the statutes mentioned in the definition of "sexual assault survivor." Yet they are encompassed by the broader definition of "survivor." Limiting "survivor" to sexual assault offenses, therefore, does not render statutory language superfluous or meaningless. Because

23

section 595.201.3(11)'s definition of "survivor" is limited to victims of sexual assault offenses, SB 569 contained only one subject that was properly conveyed by its title.[11]

## Conclusion

The circuit court did not err in determining 1) section 595.201, as applied to defense attorneys, is constitutionally invalid and 2) the passage of SB 569 was procedurally proper. As a result, the judgment is affirmed.

_____
Mary R. Russell, Judge

All concur.

---

[11] Because the circuit court properly held the General Assembly did not violate the original purpose, clear title, and single subject requirements of the Missouri Constitution, this Court need not address Challengers' arguments regarding severance.

24